## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROCHE DIAGNOSTICS CORP. and ROCHE DIABETES CARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONNIE E. DICKSTEIN, KENNETH G. FASSE, JAMES E. BINSON I, & CHRISTOPHER F. SHAYA, <br><br> Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiffs Roche Diagnostics Corp. and Roche Diabetes Care, Inc. (together, "Roche"), for their Complaint against Defendants Donnie E. Dickstein, Kenneth G. Fasse, James E. Binson I, (collectively, the "Binson's Defendants") and Christopher F. Shaya, hereby allege as follows:

## NATURE OF THE ACTION

1.      Roche, a manufacturer of medical equipment for patients with diabetes, including blood glucose test strips, brings this action seeking compensation for damages caused by Defendants' fraud and other wrongful acts.

2.      Defendants participated in a brazen scheme to defraud Roche. Defendants relied on falsehoods and misrepresentations to obtain discounted not-for-retail-sale ("NFR") blood glucose test strips from Roche.  These NFR test

strips were intended for sale only to beneficiaries of insurance plans that cover test strips under a medical benefit, often referred to as a durable-medical-equipment ("DME") benefit.[1]

3.     Defendants knew that Roche would not sell discounted NFR test strips to the companies they controlled unless those strips were to be sold exclusively to DME beneficiaries. Defendants tricked Roche into selling them large quantities of NFR test strips by falsely representing to Roche that they had located a new set of patients covered by DME insurance to whom they would sell the NFR test strips. In fact, Defendants had not located new patients.

4.     Indeed, Defendants had no intention of selling the NFR test strips to patients at all.  Rather, the Binson's Defendants, acting through their closely controlled corporate entities Binson's Hospital Supplies, Inc. ("Binson's") and Northwood, Inc. ("Northwood"), planned to flip the test strips at substantial profit to shell entities controlled by Defendant Christopher Shaya.  Shaya planned to flip them at an additional markup to other gray-market distributors located in Florida. The gray-market distributors that purchased the NFR test strips from Chris Shaya sold them to retail distributors, and they were ultimately dispensed at retail pharmacies.

---

[1] Roche has a different line of not-for-retail-sale test strips, not at issue here, that are sold through certain government programs.  As used in this complaint, the term "NFR" will refer to not-for-retail-sale test strips that are intended for sale to beneficiaries of DME insurance plans.

5. The reason Defendants' diversion of NFR test strips into retail channels was so lucrative is that retail test strips have a much higher list price and are reimbursed by insurance at a much higher rate than NFR test strips. By purchasing NFR test strips from Roche on false pretenses and selling them to retail distributors, Defendants were able to profit from the substantial difference in list price between NFR and retail test strips.

6. These profits came directly out of Roche's pocket. Roche pays large rebates to pharmacy benefit insurers (or their pharmacy benefit managers, i.e. "PBMs") in connection with retail test strips, but it does not pay rebates for NFR test strips. That is the reason for the substantial difference in list price between retail and NFR test strips. When NFR test strips are sold at retail pharmacies and paid for by pharmacy benefit insurance, Roche pays large, unwarranted rebates to pharmacy benefit insurers or PBMs. These rebates represent direct out-of-pocket losses for Roche.

7. Defendants fraudulently induced Roche to amend its contract with Binson's and Northwood so as to enable their diversion. Thereafter, Defendants began to steadily increase the volume of NFR test strips they purchased from Roche. To induce Roche to sell them these increased volumes, Defendants made multiple additional false and misleading statements to Roche.

8.      On multiple occasions, for example, the Binson's Defendants provided Roche with a list of health insurance plans which, they asserted, covered the DME patients they were supposedly selling to.  Chris Shaya provided these lists of insurance plans to the Binson's Defendants, knowing and intending that they would be passed on to Roche.  The lists of insurers were completely fraudulent.  Defendants were not selling Roche's test strips to patients and had no idea which insurers ultimately paid for the NFR test strips they were diverting. The sole purpose of the lists was to deceive Roche.

9.      Meanwhile, Defendants carefully structured their purchases to conceal the nature of their business from Roche.  Defendants ramped up their volume of purchases slowly and steadily, to make it look like they were growing their business legitimately by acquiring new DME patients.  In fact, Defendants were flipping the entire volume of NFR test strips to gray-market distributors in large shipments and had no business reason to show smooth growth in their purchases. As text messages between Defendants Donnie Dickstein and Chris Shaya make clear, the sole reason for this was to deceive Roche.

10.      Defendants profited personally from their fraudulent conduct.  In his texts, Dickstein repeatedly referred to the BMW automobile that he was going to purchase as a result of his commissions on sales of Roche NFR test strips. Dickstein ultimately did succeed in purchasing a BMW with his commissions. As

for Chris Shaya, he made so much money from the fraud that he treated his co-conspirators Dickstein and Ken Fasse to a weekend in Las Vegas to attend a prizefight.  Shaya chartered a private jet to take the friends to Las Vegas to see the fight.

11.     Roche ultimately discovered Defendants' fraud and stopped selling NFR test strips to Binson's or Northwood.   When this occurred, the Binson's Defendants scrambled to cover up their wrongdoing.  They told Roche a series of lies about the true nature of their diversion scheme, concealing the truth for more than a year after their fraud was originally exposed.  The Binson's Defendants also asked Chris Shaya to sign a backdated contract falsely stating that he had been obligated to sell to DME beneficiaries all along.  Shaya refused to do so, rightly stating that the contract "stinks of a coverup."

12.     By the time Roche cut off Defendants' fraudulent diversion operation, an immense amount of damage had already been done.  Defendants diverted more than 1.5 million boxes of NFR test strips to retail channels, causing at least $84 million in damages to Roche.

13.     Roche brings this action to obtain compensation for its losses and to hold the Defendants responsible for their decision to lie repeatedly in order to gain millions of dollars in profits.

## PARTIES

14.     Plaintiff Roche Diagnostics Corp. is a corporation organized under the laws of the State of Indiana, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Holding AG is the ultimate parent company of Roche Diagnostics Corp.

15.     Plaintiff Roche Diabetes Care, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Diagnostics Corp. included Roche's U.S. commercial diabetes business until November 2015, when the U.S. commercial diabetes business was transferred to a separate legal entity, Roche Diabetes Care, Inc.   Roche Diabetes Care, Inc. is engaged in the business of manufacturing and marketing blood glucose test strips.  Roche Holding AG is the ultimate parent company of Roche Diabetes Care, Inc.

16.     Defendant Donnie E. Dickstein is a Michigan citizen, having an address at 35898 Tamarack Court, New Baltimore, Michigan 48047.  Dickstein is Director of Northwood, Inc.

17.     Defendant Kenneth G. Fasse is a Michigan citizen, having an address at 57580 Ridgewood Drive, Washington, Michigan 48094.  Fasse is Executive Vice President and Chief Operating Officer of Binson's Hospital Supplies, Inc. and President of Northwood, Inc.

18.    Defendant James E. Binson I is a Michigan citizen, having an address at 22528 Statler Street, Saint Clair Shores, Michigan 48081.  James E. Binson is Chairman, President, and Chief Executive Officer of Binson's Hospital Supplies, Inc.

19.    Defendant Christopher F. Shaya is a Michigan citizen, having an address at 20838 Maybury Park Drive, Northville, Michigan 48167.  Shaya was an owner and officer of Olympus Global, LLC ("Olympus"), Delta Global, LLC ("Delta"), and Alpha XE LLC ("Alpha").

## JURISDICTION AND VENUE

20.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

21.    The amount of damages at issue exceeds $75,000, exclusive of interest and costs.

22.    This Court has personal jurisdiction over the Defendants because they are citizens of Michigan and this action arises in part out of false and misleading statements Defendants made in Michigan.

23.    Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district, and one or more of the Defendants is subject to personal jurisdiction in this district.

## FACTS COMMON TO ALL CLAIMS

### Roche's Blood Glucose Test Strips

24.     Roche is one of the leading manufacturers of blood glucose test strips. Millions of people with diabetes depend on Roche's test strips to monitor their blood sugar.  Diabetes patients use Roche's test strips by placing a drop of blood on a strip and inserting the strip into a meter, which provides a blood glucose reading.

25.     Roche sells its blood glucose test strips in different packages and through different distribution channels targeted to patients with different types of insurance coverage.  There are two distribution channels for Roche blood glucose test strips relevant here:  retail and NFR test strips.

26.     Roche's retail test strips are intended for sale at retail pharmacies. Retail test strips may be sold to anyone, including people who do not have insurance and pay cash.  However, over 90% of purchasers of Roche's retail test strips use insurance. Retail test strips are covered by pharmacy benefit insurance, the same type of insurance that covers prescription drugs.

27.     By contrast, Roche sells its NFR test strips to mail-order DME distributors.[2]  These distributors are contractually restricted to sell the strips only to

---

[2] As noted above, Roche also has a different line of not-for-retail-sale test strips that are intended for sale through certain government programs.  These test strips are not at issue here. The term "NFR" test strips, as used in this complaint, refers to not-for-retail-sale test strips that are intended for sale to DME beneficiaries.

patients covered by DME insurance, the type of insurance that covers medical equipment such as wheelchairs and catheters (some DME distributors are permitted to resell to smaller DME distributors that have been expressly identified to and pre-approved by Roche).

28.    Retail and NFR test strips are distinct products with different packaging.  The package for the mail-order NFR version of Roche's Aviva Plus test strips features the following warnings, printed in easy-to-read, bolded black lettering on a yellow background: "Not for Sale in Retail Outlets" and "Exclusively for Mail Order Use."  These warnings are of course not printed on the package for the retail version of Aviva Plus test strips.

29.    Retail and NFR test strips also have different National Drug Code ("NDC") numbers printed on their packages.  An NDC is a unique numerical identifier recorded by the U.S. Food and Drug Administration, which regulates these devices.  As an example, one of Roche's most widely-used blood glucose test strip products is Accu-Chek Aviva Plus, most commonly sold in 50-strip box.  The NDC for the mail-order NFR version of this product is 65702-0436-10, while the NDC for the retail version is 65702-0407-10.  The NDC is printed on each box's package.

30.    The list prices for retail and NFR test strips are very different.  During the time period relevant to this complaint (2014-2015) Roche sold retail test strips

to wholesalers for approximately $65-71 per 50-strip box.  During that time period, Roche generally sold its NFR test strips to DME mail-order distributors for $13 or less per 50-strip box.

31.     The insurance reimbursement rates for retail and NFR test strips are also very different.  During the relevant time period, pharmacies that dispensed retail test strips were reimbursed by pharmacy-benefit plans at a small markup from the $65-$71 wholesale list price.  DME distributors that dispensed NFR test strips were reimbursed by DME insurers at a small markup on the $13 NFR price.

32.     However, these large discrepancies in list price and insurance reimbursement rate did not translate to large differences in the net revenues received by Roche.  Rather, most of the list price difference between retail and NFR test strips was attributable to rebates that Roche paid to pharmacy-benefit insurers or PBMs for sales of retail strips.  Under contracts with the insurers or PBMs, Roche paid rebates averaging about $43 for every 50-strip box of retail test strips reimbursed by a pharmacy-benefit insurance plan.  Roche did not pay rebates to DME insurers that paid for the NFR test strips.  Roche's net per-box revenues for retail strips were therefore only somewhat great than their net revenues for NFR test strips.

33.     The only way that Roche is able to sell NFR test strips at a lower price than it charges for retail strips is to contractually require distributors of NFR test

strips to dispense them to DME patients. Otherwise, customers could purchase NFR test strips and sell them as retail strips, causing substantial losses to Roche. These lower prices for NFR test strips are offered in return for and in reliance on the DME mail-order distributors' compliance with the terms of their contracts with Roche, called "Product and Pricing Agreements."

34. Because of the significant differences between retail and NFR test strips in their list prices, insurance reimbursement rates, and rebates, it is crucial for fairness and functioning of the marketplace that the test strips be sold only within their intended channels. Diversion of NFR test strips into the retail channel not only deprives Roche of retail sales, it also causes an out-of-pocket loss on each box of NFR test strips that is paid for through pharmacy-benefit insurance, because the rebates Roche pays the insurers or PBMs (about $43 per box) are higher than the price Roche receives for NFR test strips ($13 or less per box).

35. Because of this potential for harm, Roche takes measures to prevent distributors from diverting blood glucose test strips outside their intended channels. These measures include, but are not limited to, ensuring that contracts with distributors of NFR strips prohibit the diversion of strips outside of their intended channels. These measures also include gathering information from potential distributors in an effort to confirm that they are legitimate DME distributors and

trustworthy partners.   Roche relies on its distributors to provide truthful and accurate information to Roche.

**Roche's Agreement With Binson's/Northwood**

36.    On February 10, 2011, Roche entered into a Product and Pricing Agreement (the "Agreement") with Binson's, which contracted on behalf of itself and its subsidiary, Northwood.  The Agreement was signed by Defendant Kenneth Fasse on behalf of Binson's and Northwood.

37.    Under the Agreement, Binson's and Northwood were only permitted to sell Roche's NFR test strips to patients covered by DME insurance or to "Participating Durable Medical Equipment Providers" which are approved by Roche, specifically enumerated in the Agreement, and which are required to resell the NFR test strips only to patients covered by DME insurance.  Defendant Donnie Dickstein testified "the intention of the contract was to have Northwood only sell to the DME channel."

38.    It is well understood in the medical supply industry that DME products may only be sold through DME channels, not retail channels.  Fasse testified there is a "basic assumption and understanding between the parties that the DME product is intended to be sold only to DME channels." and that "the agreements are structured to ensure that that occurs."

39.    The Agreement was amended on February 10, 2011, July 1, 2013, October 1, 2013, February 1, 2014, and July 21, 2014.  The restrictions on who Binson's and Northwood could resell to always remained in place.

40.    In exchange for Binson's and Northwood's agreement to sell Roche NFR beneficiaries to DME beneficiaries only, Roche provided a low price to Binson's and Northwood.  Roche provided Binson's and Northwood with prices for commercial DME beneficiaries of between $10 and $17 per 50-strip box.

41.    Typically, Roche sold the test strips to Binson's and Northwood at a somewhat higher price than this, and then provided a rebate to achieve the net price.  Roche required Binson's and Northwood to submit utilization reports (also referred to as "sales tracings") in order to receive their rebates.  The reports included data on each individual sale of Roche NFR test strips, including individual patients' unique prescription numbers and dates of sale.  These reports verified that Binson's and Northwood's customers were in fact DME beneficiaries.

42.    From 2011 until July 2014, Binson's and Northwood maintained a steady business in Roche NFR test strips, with average sales of approximately 5,000–10,000 boxes per month.  During this time, Binson's and Northwood submitted reports to Roche showing that their sales were to DME beneficiaries.

**Defendants Fraudulently Induce Roche to Amend its Contract With Binson's & Northwood to Accommodate their Diversion Scheme**

43.     On May 2, 2014, Northwood entered into a "Distributor Agreement" with Olympus Global, LLC, a company owned and operated by Defendant Christopher Shaya and his former business partner, Jeremiah Mankopf.  Defendant Fasse executed the agreement on behalf of Northwood.   Under this agreement, Northwood agreed to sell test strips to Olympus.  The agreement did not require Olympus to sell the test strips to DME patients.

44.     To the contrary, Shaya told the Binson's Defendants he intended to resell the test strips to Medical Supply Solutions, Inc. ("MSSI"), a diverter located in Sunrise, Florida.   As a diverter, MSSI resells products in bulk to other distributors in the grey market.  Shaya never told the Binson's Defendants the test strips would be sold to patients or DME providers.

45.     The Binson's Defendants recognized that to comply with its contractual obligations to Roche, Northwood would need to add Olympus to its contract as a "Participating Durable Medical Equipment Provider."   But Roche would never approve this, because Olympus was a diverter, not a DME provider.

46.     The Binson's Defendants further recognized that under the Agreement then in effect, it would be impossible to sell test strips to Olympus because they were required to submit utilization reports (a/k/a sales tracings) in order to receive their rebates.  They would be unable to submit sales tracings for test strips sold to

Olympus, because neither the Binson's Defendants nor Shaya knew where the test strips would ultimately be sold or which insurers would pay for them.

47.     On May 16, 2014, Donnie Dickstein emailed Christopher Shaya, stating "I am still trying to figure out how to make this work within the framework of our manufacturing partners [sic] contracts."  He asked Shaya to "send [him] some language" for the Roche agreement that would "enable to sell to other [sic] without needing the end user tracings."

48.     In order to induce Roche to agree to sell NFR test strips to Northwood without requiring sales tracings, Defendants made, caused to be made, and conspired to make multiple false statements of fact.  Roche reasonably relied on these statements, either directly or indirectly, and was damaged as a result.

49.     In a conference call on or about June 24, 2014, Fasse and Dickstein told Roche employee Colleen Miller that Northwood had a large customer base of patients with DME insurance that it could switch to Roche test strips if Northwood could purchase NFR test strips at a low price without the need to submit sales tracings.  Fasse and Dickstein repeated this claim to Adams and Miller on or about July 14, 2014 in another phone call.  This was false: Fasse and Dickstein had no base of DME beneficiaries to sell to.  These statements were made for the purpose of inducing Roche to amend the Agreement to accommodate the diversion scheme

with Christopher Shaya and to induce Roche to sell Northwood large quantities of NFR test strips.

50.     At no point during contract negotiations in 2014 did Defendants tell Roche about Olympus or Shaya.  Instead, the Binson's Defendants repeatedly told Roche they had access to large volumes of new business through commercial DME insurance companies.  They requested amending the Agreement to not require "patient specific" tracings, stating that they had an "additional commercial volume" of patients that would purchase the strips if the contract was amended. This was all a lie.  There was no additional commercial volume.  The plan was to sell the strips to Olympus, which would resell them to MSSI, which would then resell them to other, unknown distributors.

51.     On July 2, 2014, Colleen Miller of Roche emailed Donnie Dickstein about the potential contract amendment and asked for "information regarding the commercial contracts Northwood has in place (i.e. what plans they work[] with)" that she could provide to Roche's Vice President of Sales.

52.     On July 7, 2014, Dickstein emailed Shaya and stated "Roche indicated that their VP will be asking about the health plans we will be submitting on the tracings reports so can you please send me a list of the health plans?"  Dickstein asked Shaya for help in responding to this request.

53.     Shaya emailed Dickstein a list of health plans but cautioned him "I don't know if they are a provider of diabetes for all of them [sic] . . . I would not send the entire list without reviewing as you don't want to send a non diabetes plan."  Shaya understood that Dickstein intended to show this list to Roche for purposes of renegotiating the Agreement.

54.     On July 7, 2014, after receiving the list of insurers from Shaya, Dickstein responded to Colleen Miller's inquiry, stating "[b]elow is a list of payers we discussed for the addendum.  Please let me know when you think we can have approval to move forward."  He included a selective list of the insurers Shaya sent to him.

55.     Shaya and the Binson's Defendants understood that by providing the list of insurers in response to Roche's request for the "commercial contracts Northwood has in place," they were representing to Roche that Northwood had contracts with those insurers to pay for NFR test strips to be dispensed to patients under a DME benefit.

56.     This was false and Defendants knew it was false.  Northwood did not have contracts with these insurers.  Defendants told this lie in order to induce Roche to amend the contract to enable Northwood to purchase NFR test strips without providing sales tracings and to induce Roche to sell Northwood large quantities of NFR test strips.

57.    Shaya agreed the list was just "something to give to Roche to help in [Northwood's] negotiations with Roche" and that he "wanted the negotiations with Roche to go well because [he] wanted to be able to buy test strips at a low price and mark them up and sell them to MSSI."

58.    On July 9, 2014, Colleen Miller of Roche sent an email to Defendant Donnie Dickstein asking him to confirm that Northwood's new "volume is getting shipped directly to end users (patients) and not to other DME's."  Mr. Dickstein replied "confirmed."

59.    By answering in the affirmative to Miller's question, Dickstein represented that the contracts he had previously told Miller that Northwood had in place with commercial insurers provided for the shipment of test strips directly to patients.  Dickstein's representation was a lie.  Northwood had no contracts with those commercial insurers and did not have any arrangements in place to ship test strips directly to patients.  Mr. Dickstein has testified that his July 9, 2014 email was "inaccurate."  His boss, Defendant James Binson I, Binson's CEO, testified that Mr. Dickstein's email was "bullshit."

60.    In reliance on the fraudulent statements detailed above, Roche executed an amendment to the Agreement on July 21, 2014.  Roche would not have agreed to the amendment but for Binson's and Northwood's false statements.

61.    Defendant Kenneth Fasse executed the amendment for Binson's and "by and on behalf of Northwood, Inc."  Under the amendment, Northwood could purchase NFR test strips from Roche at a flat price of $10.67.  The restrictions on who Binson's and Northwood could resell strips to—DME beneficiaries and specifically-enumerated DME providers—remained in place.  But because Northwood no longer had to obtain rebates from Roche, it could purchase NFR test strips at a low price without submitting sales tracings that would confirm the strips were being dispensed to DME patients.

## Defendants Make Multiple Additional Misrepresentations to Induce Roche to Continue Shipping Them NFR Test Strips

62.    Having succeeded in fraudulently inducing Roche to amend the contract in order to enable their profitable diversion, Defendants quickly realized that they were in a position to sell virtually unlimited amounts of NFR test strips to gray-market distributors.  Because the distributors stood to earn immense profits by purchasing NFR test strips and selling them in retail channels, they had an insatiable appetite for any diverted NFR product that Defendants could provide them.

63.    Although Defendants had succeeded in fraudulently obtaining contract terms that would enable their diversion, they had not yet secured any commitment by Roche to sell them a large volume of NFR test strips.  The Agreement between Roche and Binson's and Northwood did not specify the

volume of NFR test strips that Roche would sell to Binson's and Northwood and did not require Roche to sell Binson's and Northwood in whatever quantities they ordered. Rather, this volume would be determined by periodic orders submitted by Binson's and Northwood and agreed to by Roche.

64.     Defendants knew that Roche would not sell them large volumes of NFR test strips unless Roche continued to believe that Northwood was in fact selling the test strips directly to DME patients. Defendants therefore repeatedly deceived Roche into believing they were shipping NFR test strips to patients covered by DME insurance when in fact this was not true.

**July 2014: Fasse Provides False Forecast of DME Beneficiaries**

65.     Ten days after the execution of the July 2014 amendment facilitating Northwood's diversion of large numbers of strips to Olympus, Fasse emailed Roche's credit department and stated "[s]ince we last communicated we've determined that our forecast was understated and our actual monthly volume will be in the range of 40,000 boxes." Fasse requested that Northwood's credit line be doubled.

66.     Fasse knew that Roche would understand his communication to mean that Northwood had contracts or business arrangements in place enabling it to make more sales of NFR test strips to DME beneficiaries than previously stated. This was not true and Fasse knew it was not true. Rather, the reason that Fasse

increased his forecast was so that Defendants could increase their profits by diverting more of Roche's NFR products to retail channels.

67.    In reliance on Fasse's misrepresentations, Roche increased Northwood's credit line and continued to sell NFR test strips to Northwood.

### December 2014: Dickstein and Shaya Provide Fraudulent List of Insurers to Roche

68.    Defendants steadily increased their purchases of NFR test strips from Roche.  Around December 2014, in connection with a request for another increase in their credit, Roche asked Binson's and Northwood for additional factual information regarding their increased purchases, including the insurers covering the patients Northwood was servicing and the source of the increased sales volume.

69.    In response to the request for a list of insurers, Dickstein, acting with Fasse's knowledge and approval, again asked Shaya to help him compile a list of insurers to give Roche.  Shaya obtained a list of insurers from a business contact in Florida and sent it to Dickstein.  Shaya knew and intended that the list would be provided to Roche under false pretenses in order to induce Roche to continue selling NFR test strips to Northwood.

70.    Shaya knew that this list of insurers had no connection to the test strip business he was doing with the Binson's Defendants.  Rather, Shaya knew that the list would be used to falsely represent to Roche that the Binson's Defendants were selling NFR test strips directly to DME beneficiaries when in fact they were not.

The Binson's Defendants also understood that providing the list of insurers to Roche was a misrepresentation. Shaya never told the Binson's Defendants that the strips were being dispensed to patients of these insurers.

71. Dickstein responded to the list Shaya provided by asking for help revising it to make it more believable for Roche. Dickstein asked Shaya to "please give your contact a call and specifically ask her from the top which of these plans are pharmacy benefits for diabetic supplies? I do not want to submit any that are pharmacy benefits because that would open up a whole bunch of questions."

72. Meanwhile, Roche sales manager Noelle Adams contacted Dickstein by telephone to ask him where Northwood's volume was coming from. Dickstein falsely told Adams that Northwood was selling Roche's NFR test strips to Northwood's customer base of DME beneficiaries, many of whom had previously purchased test strips from LifeScan, a competitor of Roche's. None of this was true. Northwood had no customer base of DME patients and had not switched patients from LifeScan products to Roche products.

73. On December 9, 2014, Dickstein sent Adams a list of insurers, knowing it was fake, stating "[p]lease see the below updated payer list as well as an updated forecast." By sending this list to Roche, Dickstein represented that Northwood had contracts in place with the listed insurers and that Northwood was

selling Roche's NFR strips directly to patients that were covered by these insurers. All of this was false.

74.    In reliance on the false information provided by Dickstein, Roche increased Northwood's credit line and continued selling discounted NFR test strips to Northwood.

### December 2014: Fasse Increases Forecast Based on False "Increase" in "Payer Portfolio"

75.    Dickstein's December 9, 2014 email also forwarded Adams a purchase forecast from Fasse.  Fasse prepared the forecast knowing and intending that it would be sent to and relied on by Roche.

76.    Fasse's forecast saw Northwood's projected purchases nearly double from the 40,000 boxes a month they projected in July 2014 when they first began selling to Olympus (which was itself an increase from Northwood's original forecast).

77.    Fasse stated that the increased volume was the result of an "increase in the payer portfolio."  This was false.  Northwood did not have a payer portfolio for the NFR test strips it was purchasing from Roche and there was no increase in Northwood's payer portfolio.

78.    In reliance on the information provided by Fasse and Dickstein, Roche increased Northwood's credit line and continued selling discounted NFR test strips to Northwood.

**2014-2015: Dickstein and Shaya Misrepresent the Reasons for Northwood's Increase in Volume**

79.   Defendants understood that sharp increases in Northwood's test strip purchases or inconsistent purchase patterns might indicate to Roche that they were reselling to wholesalers and not servicing DME patients.  Throughout 2014 and 2015, Shaya and Dickstein communicated extensively about how to structure their purchases to avoid suspicion.  Dickstein told Shaya "[t]he orders should continue and grow to show consistency."

80.   From July 2014 through August 2015, Defendants steadily increased their orders of NFR test strips and continually deceived Roche about the reasons for these increases.  On June 12, 2015, for example, Shaya instructed Dickstein to "[h]old off on Monday order" because he thought it was "too many" and they should "split the order in half" to avoid a "huge spike."

81.   On another occasion, Shaya asked Dickstein to hold part of his order to avoid "a huge flag" and reminded him that they wanted "to stay within consistent numbers."  When Dickstein suggested they begin purchasing 30,000–40,000 boxes per week from Roche, Shaya told him "[t]he only reason we have not done those numbers is I don't want to raise flags."  Shaya confirmed in testimony that what he meant was he didn't "want to alert Roche that the sales are not being made directly to patients."

-24-

82.     These efforts to mislead Roche succeeded.  Roche continued to ship NFR test strips to Northwood.  Had Northwood's purchases raised the "huge flags" that Defendants sought to avoid, Roche would have stopped shipping NFR test strips to Defendants before it did.

### July and August 2015: Dickstein and Fasse Lie to Roche About the Reasons for Northwood's Increased Volume

83.     In June 2015, Noelle Adams asked the Binson's Defendants for more information regarding who they were selling to.   Dickstein told her the business was in the middle of making a contract bid and "that she's going to have to wait a few weeks."  When Shaya later texted Dickstein to ask if he was nervous Roche would catch them, Dickstein responded "[t]hey first asked in June and we fought it off so I feel we will be ok."

84.     In July 2015, Noelle Adams again asked the Binson's Defendants for information on the patients they were selling test strips to.  This was impossible— the Binson's Defendants were selling all the strips to Shaya and had no idea where they ended up.  Dickstein and Fasse discussed how to buy time, with Dickstein suggesting to Fasse that "[m]aybe our response should be that we are busy working on the Michigan [request for proposal] and we will start on this mid August?"  Dickstein also noted to Fasse that they would "have to come up with [a] plan" on how to satisfy Roche's request for patient information for Northwood.

85.     The Binson's Defendants ignored Adams' request, and the following month she sent them another email stating she needed an explanation for why Binson's and Northwood's purchases increased markedly between the first and second quarters of 2015.  Dickstein responded that he had "instructed [Binson's] to increase Roche market share" and the growth was due to a combination of converting existing patients from competitors' brands and adding new patients. This was false.  Northwood had added no new patients.  Northwood was selling all of the test strips to Chris Shaya's companies.

86.     On August 31, 2015, in response to Adams' continued requests for sales tracings, Fasse told her Northwood "did not configure systems for extracting patient details."  This was false. The reason that Northwood could not provide patient details had nothing to do with the way it configured its systems.  The reason was that Northwood was not selling test strips to patients at all.

**Defendants Personally Profit from Their Fraud**

87.     Kenneth Fasse and James E. Binson I own and/or control Binson's and Northwood, and caused a substantial portion of the profits from their fraudulent diversion to be transferred directly or indirectly to themselves and their family members.

88.     Donnie Dickstein personally made approximately half a million dollars in commission between July 2014 and August 2015 by selling Roche test strips to Olympus and Delta.

89.     Dickstein and Christopher Shaya extensively discussed the BMW Dickstein planned to purchase with his share of the profits they made by cheating Roche.  In July 2015, Dickstein told Shaya that he "crunched the numbers" and if they keep up their purchase rate he "can make the BMW happen in August." Dickstein did in fact buy a BMW with the money he made from the scam.

90.     Shaya made approximately $8 million from his fraudulent diversion scheme.  Shaya used part of his gains to treat his business partners to a weekend in Las Vegas in May 2015 to attend the boxing match between Floyd Mayweather Jr. and Manny Pacquiao, an event billed as the "Fight of the Century."   Shaya chartered a jet to take himself, Dickstein, Fasse, and their families to Las Vegas at a cost of approximately $40,000.

**Defendants Stonewall and Obstruct Roche's Investigation Into Their Fraud**

91.     On August 31, 2015, Dickstein set up a meeting with Shaya, telling him "Roche is asking for some general tracing info.  In order to buy ourselves time we told them we will work on something and would discuss with them in October."

92.     At some point around this time, Dickstein asked Shaya if his business contacts in Florida "would give us a massive list of their diabetic patients" so the Binson's Defendants could "manipulate the data," permitting them to submit phony sales tracings.  But Shaya was unable to obtain this data for them to manipulate.

93.     On September 11, 2015, Binson's sent Roche an initial set of utilization reports for its own sales, but not for Northwood.  When Adams asked when Roche could expect the Northwood utilization reports, Dickstein claimed that Northwood was "working on it" and would provide the reports in a "few weeks" but that it would not be possible to do so sooner due to the high volume of Northwood's sales and technical difficulties.

94.     That same day, Dickstein texted Shaya "let's try and get two more big orders in before next Friday."  A week later, Dickstein texted Shaya "I would like to maximize the month of September for orders . . . In case they end up freezing us in the beginning of October I want to maximize this month."  Dickstein testified he wanted to do this because he was concerned "Roche may freeze us" and he wanted to get as many purchases in as possible before that happened.

95.     On September 25, 2015, Roche informed Fasse and Dickstein it was holding its orders due to "major issues we have become aware of around contract compliance."   Knowing this day would come eventually, Fasse forwarded the email to Dickstein, stating "[w]ell, there it is."

96.     Roche's head of sales, Dan Majestic, spoke with Fasse and Dickstein by phone and told them Roche would not resume shipments unless Northwood provided the requested utilization reports.  In this conversation in September 2015, Dickstein claimed Northwood had been selling Roche NFR test strips to between

15 and 25 DME providers in Florida which he refused to identify.  This was the first time Roche was told that Northwood was not selling directly to patients.  But Dickstein's statements were still false.  Northwood had not been selling to DME providers or to anyone in Florida; it sold all of the test strips to Olympus and Delta.

97.    On October 7, 2015, in response to questions from Roche regarding Northwood's purchases, Fasse sent an email to Roche's legal counsel, Julie Dilts, stating:

> Northwood aligned with DME providers who have access to commercial plans that cover diabetes testing supplies under medical benefits to facilitate a formulary of Roche Diagnostics Products.  This endeavor began in approximately July, 2014.  The overall objective has been to increases the volume of Commercial, non-Medicare diabetics utilizing ACCU-CHEK products.  The volume is the result of our efforts in facilitating an ACCU-CHEK product formulary through a limited number of providers and investing in this initiative with Northwood working capital.

Fasse's statements were false.  There were no DME providers.  Northwood sold all of its test strips to Olympus and Delta.

98.    Around September and October 2015, the Binson's Defendants attempted to have Shaya sign a contract between Northwood and Delta which they backdated to July 1, 2014.  By this point, Northwood and Delta were no longer doing business because Roche had frozen sales to Northwood, so there was no business purpose to this backdated contract.  Rather, the purpose of this contract was to create a false record that Northwood had entered into a contract that

restricted Delta's sale of NFR test strips, when in fact Northwood had never entered into such a contract with Delta.

99.     Dickstein sent a copy of the backdated contract to Shaya on October 8, 2015, telling him "Ken [Fasse] just wants this for a file in case there is any push back."  The next day he sent an updated copy that included a confidentiality clause that would bar Northwood from disclosing the names of the healthcare insurers Delta worked with.  As Shaya testified, there was no need for this, because Delta worked with no insurers and there was nothing to disclose.  Rather, the purpose of this nondisclosure provision was to give the Binson's Defendants an excuse for not answering Roche's questions.  Shaya refused to sign the backdated document, telling Dickstein it "stinks of cover-up."

100.   Dickstein provided a "simplified version" of the backdated contract he hoped would address Shaya's concerns.  But again Shaya refused to sign, responding "[t]he new one looks like a cover-up."

101.   On October 26, 2015, Dickstein sent another draft of a backdated agreement that he said "should satisfy Roche."  A few days later Dickstein told Shaya by text message that "[i]f you sign the document it makes us feel we have an argument for us being compliant to the contract."

102.   Shaya still refused to sign the backdated document, but he sent it to his contacts at MSSI, telling them "this is what he wants signed – i wont but get someone to do it."  MSSI sent it back with an illegible signature.

103.   The Binson's Defendants failed to provide Roche with any meaningful answers to its questions regarding who it was selling test strips to, and Roche terminated the Agreement.  The Binson's Defendants did not tell Roche about Christopher Shaya, Olympus, Delta, or MSSI until August 2016.

**Each Defendant Conspired with and Provided Substantial Assistance to the Other Defendants in Advancing the Fraud against Roche**

104.   Each Defendant was personally involved in and conspired to participate in the fraudulent scheme alleged herein.

105.   As alleged above, Fasse and Dickstein each made multiple fraudulent statements to Roche, which they intended for Roche to rely on so Roche would amend the Agreement and, later, increase Binson's and Northwood's credit and continue selling them high volumes of NFR test strips.  Each made their fraudulent statements with the knowledge and approval of the other.

106.   James Binson I is the CEO of Binson's and its primary owner.  In that capacity, he is routinely made aware of all major business initiatives that Binson's and its subsidiaries, including Northwood, are considering undertaking.  Before such initiatives can go forward, Mr. Binson must authorize and approve them.

107.   James Binson I has decades of experience in the durable medical equipment business.  He has admitted that he understands NFR test strips must only be dispensed to DME beneficiaries.

108.   Before Binson's and Northwood undertook to fraudulently induce Roche to sell Northwood NFR test strips to be diverted to Christopher Shaya's companies, James Binson I was told about the arrangement.  Mr. Binson authorized Dickstein and Fasse to proceed with the process of obtaining NFR test strips from Roche on false pretenses for the purpose of diverting them. Mr. Binson knew of and authorized the sale of Roche's NFR strips to Shaya's companies, and he knew of and authorized Fasse and Dickstein's false representations and omissions to Roche in order to induce Roche to enter into the amendment to the Agreement and continue selling the NFR strips.

109.   Before the diversion scheme began, Fasse sent an email to James Binson I explaining that Shaya was going to provide them with contract language they could use with Roche that would "enable[] wholesaling of test strips."  Binson knew that Northwood could only succeed in wholesaling test strips if it deceived Roche into believing it was selling directly to DME patients.

110.   In addition to being made aware of the fraud directly by Dickstein and Fasse from its inception, Binson was aware of the fraud because the profits generated by the fraud constituted a disproportionate source of Binson's and

Northwood's total profits, especially in comparison to the small margins Binson's and Northwood would typically earn by dispensing test strips legally. Binson's and Northwood are small, closely-held family corporations and the outsized profits from the fraud was unmistakable. They formed approximately 50% of Binson's net profits during the time that the diversion scheme was ongoing. Mr. Binson personally benefited financially from the fraud.

111. Christopher Shaya understood that Northwood needed to eliminate the contractual requirement to provide Roche with sales tracings in order for the diversion scheme to work. He also understood that Roche would never agree to amend the Agreement if it knew the purpose was to enable diversion. Shaya conspired with Dickstein and Fasse to fraudulently induce Roche to amend the Agreement.

112. Shaya provided the Binson's Defendants with the phony list of health plans in July 2014 "so that they could have something to give to Roche to help in their negotiations." Shaya "wanted the negotiations with Roche to go well because [he] wanted to be able to buy test strips at a low price and mark them up and sell them to MSSI."

113. In December 2014, Shaya provided another phony list of insurers to the Binson's Defendants knowing they intended to provide it to Roche so they could continue the diversion scheme.

114.   In 2014-2015, Shaya collaborated with the Binson's Defendants in structuring their purchases of NFR test strips from Roche so as not to arouse suspicion at Roche.

**Roche Reasonably Relied on the Defendants' False Statements**

115.   Defendants' false statements were made for the purpose of concealing Binson's and Northwood's diversion of Roche NFR test strips and causing Roche to sell them, and then continue selling them, NFR test strips that they could continue to divert.

116.   In reasonable reliance on these fraudulent statements, Roche sold Binson's and Northwood NFR test strips that it would not otherwise have sold them.  Roche also provided discounts and rebates to Binson's and Northwood in reliance on their false claims that they were distributing Roche's NFR test strips exclusively to DME beneficiaries.  Roche also relied on those false assurances in entering into the July 2014 amendment to Agreement and in not terminating the contract or stopping or limiting sales to Binson's and Northwood until September 2015.

117.   Prior to September 2015, Roche did not know that Northwood was doing anything other than selling Roche's NFR test strips to individual DME beneficiaries as it had agreed to do.

118.   Roche had done business with Binson's for more than fifteen years without any indication that Binson's or its affiliates were not legitimate DME distributors.  Indeed, Binson's is well known in Michigan and had a reputation for honest business practices.   Until Roche discovered the misconduct described above, it had no reason to believe that Binson's reputation was undeserved.

### Roche Suffered Large Damages from Defendants' Fraud

119.   Between July 21, 2014 (when Binson's/Northwood amended its contract with Roche) and September 24, 2015 (when Roche terminated sales to Binson's/Northwood), Northwood sold approximately 1,526,688 50-strip boxes of Roche NFR test strips (or their equivalents) to Olympus and Delta.

120.   Olympus, Delta, and another company created and controlled by Shaya, Alpha XE LLC,[3] sold the vast majority of these NFR test strips to MSSI. Shaya sold a small number of the NFR test strips to another diverter, Republic Pharmaceuticals LLC in Ann Arbor, Michigan.

121.   MSSI, in turn, sold the Roche NFR test strips to the following entities: S.P. Distributors; NE-Medical Supply USA, Inc.; Trusted Medical Supply; Masters Pharmaceutical Inc.; H&H Wholesale Services Inc.; Costal Medical Group, LLC; Acute Management Group; ADW Diabetes LLC; Universal Health Alliance Corp.;

---

[3] Initially, Olympus both purchased the DME Strips from Northwood and sold them to MSSI.  Later, Olympus made the purchases from Northwood, and Alpha made the sales to MSSI.  Delta later replaced Olympus in making purchases from Northwood, while Alpha continued to make sales to MSSI.

Sterling Distributors; MedPlus, Inc.; Dream Cereal; Value Wholesale Inc.; Brookport Inc.; Coastal Medical Group; and MEDxSURG.   These entities are gray market distributors of retail products.

122.   Substantially all of the NFR test strips diverted by the Defendants were ultimately passed off as retail products, sold at retail pharmacies, and paid for by insurance companies that believed they were covering retail test strips.   For example, approximately 490,000 boxes of NFR test strips that Roche sold to Northwood were ultimately sold to companies affiliated with Alliance Medical Holdings, LLC.   Alliance's former Director of Pharmacy Operations gave deposition testimony that all of these boxes were falsely adjudicated by pharmacies as if they were retail test strips.   Alliance is currently the subject of a federal criminal investigation for its fraudulent business practices.

123.   These patients who purchased Roche's diverted NFR test strips at pharmacies intended to buy, and believed they were buying, Roche's retail strips.

124.   Had Roche known that its heavily-discounted NFR test strips would be diverted for retail sale, it would not have sold them to Northwood.   The retail beneficiaries who ultimately purchased the diverted NFR test strips would have instead purchased retail strips.   Each sale of diverted NFR test strips therefore replaced a sale of retail strips that would have been made but for Defendants' fraud.

125.   When patients purchased diverted NFR test strips at pharmacies, pharmacists submitted insurance claims for these test strips to insurance companies covering retail test strips.  The insurance companies or their PBMs reimbursed the pharmacies for the strips and obtained rebates from Roche that were intended only for retail test strips.  Roche paid millions of dollars of unwarranted rebates to insurance companies and PBMs in connection with these claims.  These unwarranted rebates were the direct result of Defendants' fraudulent diversion of NFR test strips to retail channels.

126.   Roche is entitled to damages in the amount of the difference between the price for which it sold the diverted NFR test strips to Northwood ($10.67 per box) and the price it would have received for the retail strips the patients would otherwise have purchased (about $65 per box in 2014 and about $71 per box in 2015).  These damages total at least $84 million.

127.   Roche is entitled to damages in the amount of the unwarranted rebates it paid to PBMs and insurers as a direct result of Defendants' fraud.

128.   In March 2017, Roche filed suit against Binson's and Northwood in the Southern District of Indiana for breach of contract, fraudulent inducement, fraud, and related claims arising out of the allegations described herein.  That case is currently pending and is styled *Roche Diagnostics Corp. v. Binson's Hospital*

*Supplies, Inc.*, Case No. 1:17-cv-0949-TWP-DML (S.D. Ind.).  To date, Roche has not recovered any damages in that action.

## FIRST CLAIM FOR RELIEF

**Fraud in the Inducement (Including Aiding & Abetting Fraudulent Inducement and Conspiracy to Fraudulently Induce) (Against all Defendants)**

129.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 128 above as if set forth fully herein.

130.   As alleged above, Defendants intentionally made or caused to be made knowingly false representations to Roche in order to induce Roche to enter into the July 2014 amendment to the Agreement and to sell and continue selling Northwood discounted NFR test strips.

131.   In or before July 2014, the Defendants made or caused to be made statements to Roche that Binson's and Northwood had contracts or business arrangements in place with DME insurers that would enable them to sell increased volumes of Roche NFR test strips if Roche eliminated the need for Northwood to submit rebate requests.  Defendants further represented that these contracts or business arrangements provided for them to distribute NFR test strips directly to individual patients covered by the DME insurers.  These representations were false.

132.   Roche reasonably relied on Defendants' misrepresentations to enter into the July 2014 amendment to its Agreement with Binson's and Northwood.

Among other things, Roche agreed to eliminate the contractual requirement that Northwood submit sales tracings identifying the individual DME beneficiaries to whom they sold Roche's NFR test strips. This enabled Defendants to divert Roche's NFR test strips to retail channels. Roche further relied on Defendants' misrepresentations in agreeing to sell Northwood large quantities of NFR test strips after the parties amended the Agreement.

133. As alleged above, Christopher Shaya actively assisted and participated with the Binson's Defendants in making false representations to Roche. He repeatedly provided lists of health plans to the Binson's Defendants for the purpose of passing them along to Roche under the false pretense that Binson's/Northwood had contracts in place to sell NFR test strips to patients of those plans.

134. James Binson I knew about Dickstein and Fasse's plan to defraud Roche and personally approved, authorized, and caused them to proceed.

135. After the execution of the July 2014 amendment, the Defendants made or caused to be made additional material false statements to Roche, including that they were selling NFR test strips to individual DME beneficiaries covered by a specific list of insurance plans; that the volume of these beneficiaries was increasing; and that the increased volume of DME purchases by Northwood resulted in part from new patients taken in by Defendants.

136. Defendants made or caused to be made these false representations and material omissions with the intent of defrauding Roche. Specifically, these Defendants made or caused to be made these false representations and material omissions (i) to continue to be able to purchase Roche NFR test strips, (ii) to continue to receive substantial discounts from Roche, (iii) to receive increased credit lines from Roche, and (iv) to eliminate the need for Northwood to submit rebate requests, allowing them to commit fraud and contractual breaches undetected by Roche.

137. Defendants intended that Roche would rely on their false representations and material omissions and, as a result, would enter into the July 2014 amendment to the Agreement. Defendants also intended that Roche would rely on their false representations after July 2014 and continue selling them large volumes of NFR test strips at discounted prices.

138. Defendants never informed Roche of the scheme to obtain Roche NFR test strips and divert them to cash payers and pharmacy beneficiaries, and Roche was unaware of the scheme. Roche justifiably relied on these Defendants' misrepresentations and material omissions and was unaware of their fraud.

139. Each Defendant intentionally provided substantial assistance to each other Defendant in fraudulently inducing Roche. They could not have perpetrated

the fraudulent inducement without each other's substantial and material assistance. Each benefited from the success of the fraudulent inducement.

140.    Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to fraudulently induce Roche.    They all adopted the goal of furthering and facilitating this conspiracy.

141.    Had Roche known the true facts regarding the fraud by Defendants, it would not have entered into the July 2014 amendment to the Agreement with Binson's or Northwood or sold them NFR test strips thereafter.

142.    As a result of Defendants' conduct, Roche was injured in an amount not less than $84 million.

## SECOND CLAIM FOR RELIEF

**Fraud (Including Aiding & Abetting Fraud and Conspiracy to Commit Fraud)
(Against all Defendants)**

143.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 128 above as if set forth fully herein.

144.    As alleged above, Defendants intentionally made or caused to be made knowingly false representations to Roche and intentionally omitted material facts from Roche.

145.    Defendants made or caused to be made statements to Roche that Binson's and Northwood were only distributing Roche NFR test strips to

-41-

individual DME beneficiaries when in fact Northwood diverted over 1.5 million Roche 50-strip boxes to Olympus and Delta.

146.   As alleged above, Christopher Shaya actively assisted the Binson's Defendants in making false representations to Roche.   In particular, Shaya provided lists of health plans to the Binson's Defendants for the purpose of passing them on to Roche along under the false pretense that Northwood had contracts or business arrangements with those insurers to dispense NFR test strips to patients of those plans.

147.   As alleged above, James Binson I was informed of Dickstein and Fasse's plan to defraud Roche and personally approved and authorized and caused them to proceed.

148.   Defendants made or caused to be made these false representations and material omissions with the intent of defrauding Roche.   Specifically, they made or caused to be made these false representations and material omissions (i) to continue to be able to purchase Roche NFR test strips, (ii) to continue to receive substantial discounts from Roche, (iii) to receive increased credit lines from Roche, and (iv) to eliminate the need for Northwood to submit rebate requests, allowing them to commit fraud and contractual breaches undetected by Roche.

149.   Defendants never informed Roche of the scheme to obtain Roche NFR test strips and divert them to retail channels.

150.   Defendants knew and intended that Roche would rely on their false representations and material omissions and, as a result, would incorrectly provide Binson's and Northwood with discounts, lose sales of retail strips, and make rebate payments to the pharmacy benefit insurers.   The entire scheme depended upon Roche continuing to supply heavily-discounted NFR test strips to Northwood, which would not have happened but for the false representations and material omissions of all Defendants.

151.   Each Defendant intentionally provided substantial assistance to each other Defendant in defrauding Roche.   They could not have perpetrated the fraud without each other's substantial and material assistance.   Each benefited from the success of the fraud.

152.   Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to defraud Roche. They all adopted the goal of furthering and facilitating this conspiracy.

153.   Roche justifiably relied on the misrepresentations and material omissions of Defendants and was unaware of Defendants' fraud.

154.   Had Roche known the true facts regarding the fraud, it would not have continued to sell NFR test strips to Binson's and Northwood, and would have made additional sales of retail strips.

155.   As a result of Defendants' conduct, Roche was injured in an amount not less than $84 million.

## THIRD CLAIM FOR RELIEF

### Negligent Misrepresentation
### (Against the Binson's Defendants)

156.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 128 above as if set forth fully herein.

157.   As alleged above, the Binson's Defendants made numerous misrepresentations to Roche.  The Binson's Defendants misrepresented to Roche that Binson's and Northwood were distributing Roche NFR test strips only to individual DME beneficiaries, when in fact Northwood sold over 1.5 million 50-strip boxes (or their equivalents) to Olympus and Delta.

158.   The Binson's Defendants never told Roche that its NFR test strips were being sold to third parties controlled by Christopher Shaya.

159.   These statements of fact and material omissions were false and misleading.  Additionally, these statements and omissions were negligent because Binson's and Northwood did not exercise reasonable care in verifying the accuracy of their statements or in ensuring that they did not make material omissions.

160.   The Binson's Defendants did not take any affirmative steps to correct their materially false statements or material omissions.

161.   The Binson's Defendants had a duty to provide Roche with accurate information because they knew and intended that Roche would rely on their false representations and material omissions in continuing to sell retail strips to Binson's and Northwood and in providing Binson's and Northwood with discounts.

162.   Roche reasonably relied upon these misrepresentations and material omissions and was unaware that they were false.

163.   As a result of the Binson's Defendants' conduct, Roche has been injured in an amount not less than $84 million.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against all Defendants)

164.   Roche hereby repeats and realleges the allegations in paragraphs 1 to 128 above as if set forth fully herein.

165.   As set forth above, Defendants made or caused to be made false representations to Roche and omitted material facts from Roche.

166.   As a result of these false representations and material omissions and other inequitable behavior alleged above, the Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

167.   The Defendants have no right to retain these unjust gains.

168.   If the Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

## FIFTH CLAIM FOR RELIEF

### Tortious Interference With Contract
### (Against Christopher Shaya)

169.  Roche hereby repeats and realleges the allegations in paragraphs 1 to 128 above as if set forth fully herein.

170.  Roche entered into a contractual relationship with Binson's and Northwood via the February 2011 Agreement and its amendments.

171.  Shaya knew that Binson's and Northwood had a contract with Roche to purchase NFR test strips.  Shaya became aware of this no later than May 2014, when, on information and belief, Fasse and Dickstein began to negotiate with Shaya to arrange for the diversion of Roche NFR test strips.

172.  Shaya urged the Binson's Defendants to violate their agreement with Roche by selling Roche's NFR test strips to Olympus and Delta.

173.  Shaya's conduct was malicious and without justification.

174.  As a result of Shaya's conduct, Roche has been injured in an amount not less than $84 million.

## PRAYER FOR RELIEF

WHEREFORE, Roche demands judgment against all Defendants as follows:

(a)  an order entering judgment in favor of Roche against Defendants, jointly and severally;

(b)  an order awarding Roche damages in an amount to be determined, but in no event less than $84 million;

(c)  an order awarding Roche pre-judgment and post-judgment interest;

(d)  an order awarding Roche punitive damages;

(e)  for such additional relief as the Court finds just and appropriate.

Dated: January 25, 2019                          Respectfully submitted,

*Attorneys for Plaintiffs Roche Diagnostics Corp. and Roche Diabetes Care, Inc.*

By: /s/ *Raymond W. Henney*
Raymond W. Henney (P35860)
Honigman LLP
660 Woodward Avenue, Suite 2290
Detroit, MI 48226
Phone: (313) 465-7410
rhenney@honigman.com

*/s/ Geoffrey Potter*
Geoffrey Potter, Esq.*
Aron Fischer, Esq.*
Joseph R. Richie, Esq.*
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: 212-336-2000
Fax: 212-336-2222
gpotter@pbwt.com
afischer@pbwt.com
jrichie@pbwt.com

* Application for admission to be submitted