UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROCHE DIAGNOSTICS CORPORATION
& ROCHE DIABETES CARE, INC.,

                Plaintiffs,

v.

CHRISTOPHER F. SHAYA,

                Defendant.

v.

NORTHWOOD, INC., DONNIE F.
DICKSTEIN, & KENNETH G. FASSE,

                Third-Party Defendants.

_____/

Case No. 19-cv-10264

Paul D. Borman
United States District Judge

Elizabeth A. Stafford
Magistrate Judge

OPINION AND ORDER
(1) DENYING DEFENDANT CHRISTOPHER SHAYA'S MOTION FOR
JUDGMENT ON THE PLEADINGS (ECF NO. 24) AS TO PLAINTIFF
ROCHE'S COMPLAINT
(2) GRANTING THIRD-PARTY DEFENDANTS NORTHWOOD, INC.'S,
DONNIE F. DICKSTEIN'S, AND KENNETH G. FASSE'S MOTION TO
DISMISS THIRD-PARTY PLAINTIFF CHRISTOPHER SHAYA'S
COMPLAINT (ECF NO. 25) AND
(3) DISMISSING THIRD-PARTY PLAINTIFF CHRISTOPHER SHAYA'S
COMPLAINT AGAINST NORTHWOOD, INC., DONNIE F. DICKSTEIN, AND
KENNETH G. FASSE (ECF NO. 13) WITH PREJUDICE

## I.    INTRODUCTION

This case involves an alleged scheme by Defendant Christopher Shaya to

use his companies, Olympus Global, LLC (Olympus) and Delta Global, LLC

(Delta), to purchase not-for-retail-sale (NFR) diabetes test strips from Third-Party Defendant Northwood, Inc. (Northwood) and resell them in retail markets at a significant markup. (*See generally*, ECF No. 1, Complaint.) Northwood was able purchase the strips at a low price from the manufacturers, Plaintiffs Roche Diagnostics Corp. and Roche Diabetes Care, Inc. (together, Roche) by misrepresenting to Roche who was purchasing the strips from Northwood, in breach of Northwood's contract with Roche which banned resale of the strips in retail markets. (*See generally*, *id.*) The parties are now looking to the courts to sort out the liabilities of the various players involved in the transactions.

Roche initially sued everyone involved in this scheme in the Southern District of Indiana for breach of contract, fraudulent inducement, fraud, and similar claims. (*Id.* at PgID 37–38, ¶ 128); *Roche Diagnostics Corp. v. Bison's Hosp. Supplies*, No 1:17-cv-00949, 2017 WL 4123050 (S.D. Ind. Sept. 18, 2017). Roche's claims against Olympus, Delta, and Shaya, and against individual officers of Northwood and Binson's Hospital Supplies, Inc. (Binson's), Northwood's parent company, were dismissed without prejudice by the Indiana Federal District Court for lack of personal jurisdiction. *Roche*, No 1:17-cv-00949, 2017 WL 4123050, at *6–7, 10.

Meanwhile, in late 2017, Northwood filed its own suit against Olympus, Delta, Shaya, and Shaya's business partners Jeremiah Mankopf (Olympus) and

Daniel Gladys (Delta) in Michigan state court. *Northwood, Inc. v. Olympus Global, LLC*, 2017-004622, 2019 WL 856573, at *1 (16th Mich. Cir. Ct. Jan. 18, 2019). In this suit, Northwood blamed Shaya, his partners, and his companies in its claims for negligent misrepresentation, fraudulent misrepresentation, fraud in the inducement, innocent misrepresentation, silent fraud, breach of contract, civil conspiracy to defraud, contractual indemnity, common law indemnity, piercing the corporate veil and tortious interference with a contract. *See id.* Shaya and Gladys counterclaimed against Northwood for negligence, fraud/misrepresentation, and silent fraud. *Id.* By Opinion and Order dated September 17, 2019, the Circuit Court for Macomb County granted Northwood's motion for summary disposition of Shaya's and Gladys' counterclaims. (*See* ECF No. 33, Third-Party Defendants' Motion, Exhibit A, PgID 483–92.) It found that Shaya and Gladys failed to show that Northwood owed them a duty to tell them not to sell in retail markets, failed to show that Northwood made any misrepresentation to them, and failed to show that Northwood had a legal duty to Shaya and Gladys to disclose the limitations of Northwood's contract with Roche. (*Id.*) Later, a jury rendered a verdict in favor of Shaya, Olympus, and Delta, finding that Shaya, Olympus, and Delta did not defraud Northwood.

On January 25, 2019, Roche filed this suit against Shaya as well as Kenneth G. Fasse, the President of Northwood and the Executive Vice President and Chief

Operating Officer of Binson's, Donnie Dickstein, the Director of Northwood, and James E. Binson I, the Chairman, President and Chief Executive Officer of Binson's, alleging fraud in the inducement, fraud, negligent misrepresentation (against all the defendants except Shaya), unjust enrichment, and tortious interference with a contract (against Shaya alone). (*See generally* ECF No. 1, Complaint.) The Indiana case has now been settled, and pursuant to that settlement, Roche dismissed its claims against Dickstein, Fasse, and Binson. (*See* ECF No. 6, Notice of Partial Dismissal, PgID 60.) Thus, the only remaining defendant is Christopher Shaya. His Motion for Judgment on the Pleadings (ECF No. 24) is now before the Court. For the reasons detailed below, the Court denies Defendant Shaya's Motion for Judgment on the Pleadings on all claims.

Following Roche's Dismissal of Dickstein, Fasse, and Binson, Shaya filed a Third-Party Complaint (ECF No. 12) against Dickstein, Fasse, and Northwood, alleging fraud, silent fraud, and common law indemnification. Their Motion to Dismiss (ECF No. 25) is also before the Court. As described below, the Court grants their motion and dismisses Shaya's Third-Party Complaint with prejudice.

## II. FACTS

### A. Facts as alleged in Roche's Complaint

Roche manufactures blood glucose test strips, which people with diabetes use to monitor their blood sugar. (ECF No. 1, Complaint, PgID 8, ⁋ 24.) Roche

4

sells two kinds of strips, not-for-retail sale (NFR) strips and retail strips. (*Id.* at ¶ 25.) The retail strips are sold to distributors who sell the strips to pharmacies, who then sell the strips to people without insurance and to people whose insurance covers the strips as a pharmacy benefit (like a prescription drug). (*Id.* at ¶ 26.) Roche sells NFR strips, in different packaging, to mail-order Durable Medical Equipment (DME) providers, who provide the strips directly to patients whose insurance covers the strips as a durable-medical-equipment benefit (like a wheelchair). (*Id.* at PgID 8–9, ¶¶ 27–28.)

The list prices for the retail and NFR strips are very different. (*Id.* at PgID 9, ¶ 30.) In 2014 and 2015 Roche sold its retail strips for $65-71 per 50-strip box and its NFR strips for $13 or less per 50-strip box. (*Id.* at 9–10, ¶ 30.) One reason why the price for the retail strips was so much higher than the price for the NFR strips is because Roche paid large rebates to pharmacy-benefit insurers for sales of the retail strips, but did not pay rebates on the NFR strips. (*Id.* at PgID 10, ¶ 32.) However, after the rebates, Roche still made more money on its sales of retail strips than it did on its sales of NFR strips. (*Id.*)

In order to maintain profitable sales of both kinds of strips, Roche uses strict clauses in its contracts with NFR strip distributors to prohibit those distributors from re-selling the NFR strips to retail pharmacies at a significantly higher price. (*Id.* at PgID 10–11, ¶¶ 33–35.) It is also well known in the medical supply

industry, according to Roche, that DME products like Roche's NFR strips may only be sold through DME channels, and therefore may not be sold to retail distributors or retail pharmacies. (*Id.* at PgID 12, ¶ 38.)

Binson's and its subsidiary, Northwood, were distributors of Roche's NFR strips under a contract signed in 2011. (*Id.* at ¶ 36.) The contract between Binson's, Northwood, and Roche required Binson's and Northwood to limit their sales of Roche's NFR strips to patients with DME insurance or to one of Roche's pre-approved DME providers, which were specifically enumerated in the contract. (*Id.* at ¶ 37.) The contract also included a rebate mechanism that allowed Roche to verify that the NFR strips it sold to Binson's and Northwood were being distributed to DME beneficiaries. (*Id.* at PgID 13, ¶ 41.) Roche would sell Binson's and Northwood the NFR strips at a higher price, then Binson's and Northwood would submit "sales tracings" that included data on each individual sale of the NFR strips and thereby confirmed that all the NFR strips were going to DME beneficiaries. (*Id.*) Once Roche verified the data in the sales tracings, it would provide a rebate to Binson's and Northwood. (*Id.*) From February 10, 2011 until July 21, 2014, Roche, Binson's and Northwood operated under this contract, with Roche selling approximately 5,000-10,000 boxes of NFR strips to Binson's and Northwood per month and Binson's and Northwood reselling those strips to DME beneficiaries. (*Id.* at PgID 12–13, 18, ¶¶ 36, 42, 60.)

On July 21, 2014, Roche executed an amendment to its contract with Binson's and Northwood. (*Id.* at PgID 18, ¶ 60.) The amendment allowed Northwood to purchase NFR strips at the flat price of $10.67 per box without submitting sales tracings—eliminating the rebate mechanism. (*Id.* at PgID 19, ¶ 61.) The restrictions on selling the NFR strips to DME beneficiaries and enumerated DME providers remained. (*Id.*)

Roche alleges that it agreed to this contract amendment because Fasse and Dickstein, the President and Director of Northwood, respectively, told Roche that Northwood had access to a large customer base of DME beneficiaries to whom Northwood could sell Roche NFR strips if Northwood no longer had to submit sales tracings. (*Id.* at PgID 6, 15, ¶¶ 16–17, 49.) Fasse and Dickstein first made this claim to Roche in a conference call in June 24, 2014, but they repeated it several times. (*Id.* at PgID 15–16, ¶¶ 49–50.) They said that Northwood had access to the new customers through commercial DME insurance companies. (*Id.* at PgID 16, ¶ 50.) When Roche asked Northwood for more information on these contracts and asked what insurance plans the companies work with, Dickstein emailed a list of insurers saying "[b]elow is a list of payers we discussed for the addendum. Please let me know when you think we can have approval to move forward." (*Id.* at PgID 16–17, ¶¶ 51, 54.) Two days later, Roche asked Dickstein to confirm that Northwood's new contracts with commercial DME companies required

Northwood to ship the NFR strips directly to patients and not to other DMEs, and Dickstein replied, "confirmed." (*Id.* at PgID 18, ¶¶ 58–59.) Based on the information provided about Northwood's claimed contracts and Dickstein's confirmation, Roche agreed to amend the contract and eliminate the rebate mechanism. (*Id.* at PgID 18, ¶ 60.)

However, Northwood did not have access to a new, large customer base. (*Id.* at PgID 15, ¶ 15.) It was seeking to amend its contract with Roche because of a "Distributor Agreement" it entered, on May 2, 2014, with Olympus, a company owned by Defendant Shaya and his former business partner, Jeremiah Mankopf. (*Id.* at PgID 14, ¶ 43.) In the agreement, Northwood agreed to sell Roche strips to Olympus. (*Id.*) The agreement did not require Olympus to sell the strips to DME beneficiaries, and, Roche contends, Shaya had informed Fasse, Dickstein, and Binson, the Chairman, President and Chief Executive Officer of Binson's, that Shaya intended to resell the strips to Medical Supply Solutions, Inc. (MSSI), which would then resell the strips in the "gray market," not to DME beneficiaries. (*Id.* at PgID 7, 14, ¶¶ 18, 44.) Thus, in order for Northwood to sell NFR strips to Olympus, Northwood needed to escape its contractual obligation to submit sales tracings to Roche. (*Id.* at PgID 14–15, ¶ 46.) That "need" begat the story Northwood told Roche—that it had access to a new, large customer base through commercial DME insurance providers. (*Id.* at PgID 15–16, ¶¶ 47–50.)

8

In its Complaint, Roche says that Shaya was aware that Northwood was restricted by its contract with Roche and that Shaya actively participated in telling the story that convinced Roche to modify its contract with Binson's and Northwood. (*See id.* at PgID 15–19, ¶¶ 47–60.) Specifically, Roche alleges that Dickstein emailed Shaya on May 16, 2014 saying that he was "still trying to figure out how to make this work within the framework of [Northwood's] manufacturing partners [sic] contracts," and asking Shaya to provide him with "some language" for the Roche contract that would allow Northwood to sell strips without sales tracings. (*Id.* at PgID 15, ¶ 14.) Roche further alleges that, when the Roche representative requested information on Northwood's contracts from Dickstein, Dickstein emailed Shaya asking him to send Dickstein a list of "the health plans [Northwood] will be submitting on the tracings reports." (*Id.* at PgID 16, ¶¶ 51–52.) In response, on July 7, 2014, Shaya sent Dickstein a list of health plans with the caveat, "I don't know if they are a provider of diabetes for all of them . . . I would not send the entire list without reviewing as you don't want to send a non diabetes plan." (*Id.* at PgID 17, ¶ 53.) Shaya later testified that he knew the list was "something to give to Roche to help in [Northwood's] negotiations with Roche" which he wanted "to go well because [he] wanted to be able to buy test strips at a low price and mark them up and sell them to MSSI." (*Id.* at PgID 18, ¶ 57.) Dickstein edited the list Shaya sent and then forwarded it to Roche. (*Id.* at PgID

17, ¶ 54.) Two weeks later, on July 21, 2014, Roche signed the contract amendment. (*Id.* at PgID 18, ¶ 60.)

Once the modification eliminated the rebate and sales tracings mechanism, Northwood began increasing the volume of NFR strips that it was ordering from Roche and reselling to Olympus. (*Id.* at PgID 20–21, ¶¶ 65–68.) On July 31, 2014, Fasse emailed Roche and asked if Northwood's credit line could be doubled because Northwood had recently "determined that [its] forecast was understated and [its] actual monthly volume will be in the range of 40,000 boxes." (*Id.* at PgID 20, ¶ 65.) Roche complied. (*Id.* at PgID 21, ¶ 67.) Northwood steadily increased its orders—by December 9, 2014 Northwood's sales projections had nearly doubled since the July 31 email. (*Id.* at PgID 21, 23, ¶¶ 68, 75–76.)

After one of Northwood's requests for increased credit, around December 2014, Roche asked Northwood to identify the source of its increased purchases and to identify the insurers covering the patients to whom Northwood was selling. (*Id.* at PgID 21, ¶ 68.) Dickstein asked Shaya for help compiling a list of insurers, and Shaya complied, knowing, according to Roche, that Northwood would give the list to Roche "under false pretenses in order to induce Roche to continue selling NFR test strips to Northwood." (*Id.* at PgID 21, ¶ 69.) After Shaya provided Dickstein with the list, Dickstein asked Shaya "which of these plans are pharmacy benefits for diabetic supplies" because he did not want "to submit any that are pharmacy

benefits because that would open up a whole bunch of questions." (*Id.* at PgID 22, ℙ 71.) Shaya did not tell Dickstein or any other Northwood officer that the strips Olympus was purchasing from Northwood were being sold to patients of the insurers on the list he provided because he "knew that this list of insurers had no connection to the test strip business he was doing with the Binson's Defendants [Fasse, Dickstein, Binson, and Northwood]." (*Id.* at PgID 21–22, ℙ 70.)

Dickstein sent Roche an edited version of the list provided by Shaya and told Roche that the increased volume was coming from sales to customers who had switched from a competitor's test strips. (*Id.* at PgID 22–23, ℙ 72–73.) He also sent a purchase forecast created by Fasse that cited an "increase in the payer portfolio" as the reason for the increasing purchases. (*Id.* at PgID 23, 75–76.) Roche then increased Northwood's credit line and continued selling it NFR strips. (*Id.* at PgID 23, ℙ 74.) The increased volume was going to Shaya's company, Olympus, which was selling the NFR strips in retail channels. (*Id.* at PgID 19, ℙ 62.)

Roche alleges that Dickstein and Shaya "communicated extensively about how to structure their purchases to avoid suspicion" throughout 2014 and 2015. (*Id.* at PgID 24, 79.) In support of this allegation, Roche cites the following communications: on June 12, 2015, Shaya told Dickstein to "[h]old off on Monday order" and to "split the order in half" to avoid a "huge spike" in orders; on another day Shaya asked Dickstein to hold part of an order to avoid "a huge flag" by

failing "to stay within consistent numbers;" and on a third day, Shaya told Dickstein that he had not asked them to purchase 30,000-40,000 boxes per week from Roche because he did not "want to raise flags." (*Id.* at PgID 24, ¶¶ 80–81.) When asked about these communications, Shaya explained that he did not "want to alert Roche that the sales are not being made directly to patients." (*Id.* at ¶ 81.)

At some point, Shaya dissolved Olympus and created a different company, Delta, with new business partner Daniel Gladys. (*Id.* at PgID 35, ¶ 120 n. 3.) Delta took over purchasing strips from Northwood. (*Id.*) Shaya also created another company, Alpha XE LLC, to make the sales of strips to MSSI. (*Id.*) But, whatever the structure of Shaya's companies, he used them to purchase NFR strips from Northwood and resell them in retail channels. (*Id.*)

Northwood and Shaya succeeded in avoiding additional suspicion from Northwood until the summer of 2015. (*Id.* at PgID 25, 35, ¶¶ 82–83, 120 n. 3.) In June and July of 2015, Roche asked for more information about to whom Northwood was selling its NFR strips. (*Id.* at PgID 25, ¶¶ 83–84.) Dickstein responded to the June inquiry by telling Roche it would have to wait a few weeks. (*Id.* at ¶ 83.) At that point, Shaya texted Dickstein to ask if he was nervous that Roche would catch them." (*Id.*) Northwood responded to the July inquiry with silence. (*Id.* at PgID 26, ¶ 85.) In August, Roche again asked Northwood to whom it was selling NFR strips and Dickstein responded to by saying that it was a

combination of converting existing patients from competitors' brands and adding new patients. (*Id.*) No one at Northwood mentioned that the strips were being sold to Olympus or Delta. (*Id.*)

On August 31, 2015, a Roche representative asked Northwood for specific sales tracings. (*Id.* at ¶ 86.) Fasse responded, saying that Northwood did not have systems for "extracting patient details." (*Id.*) On the same day, Dickstein set up a meeting with Shaya to discuss responding to Roche's increasing requests for information. (*Id.* at PgID 27, ¶ 91.) Dickstein asked Shaya if Shaya's business contacts could give them "a massive list of their diabetic patients" so that Northwood could "manipulate the data" and have sales tracings to send to Roche. (*Id.* at ¶ 92.) Shaya could not provide this data, however, so Northwood stuck with its strategy of delay. (*Id.* at PgID 27–28, ¶¶ 92–93.)

On September 11, 2015, after telling a Roche representative that Northwood was working on utilization reports for Roche and that the reports would be complete in a few weeks, Dickstein texted Shaya "let's try and get two more big orders in before next Friday." (*Id.* at PgID 28, ¶¶ 93–94.) A week later Dickstein told Shaya that he wanted to maximize orders for September in case Roche decided to "freeze" them. (*Id.* at ¶ 94.)

Finally, on September 25, 2015, Roche put a hold on Northwood's orders due to "major issues we [Roche] have become aware of around contract

compliance." (*Id.* at ¶ 95.) Fasse forwarded the email to Dickstein and said "[w]ell, there it is." (*Id.*) Fasse and Dickstein continued to tell Roche that Northwood had been selling to DME providers, not to Olympus and Delta. (*Id.* at PgID 28–29, ¶¶ 96–97.) In fact, Roche did not learn about Shaya, Olympus, Delta, and MSSI until August 2016. (*Id.* at PgID 31, ¶ 103.)

In October of 2015, Northwood tried to get Shaya to sign a backdated contract that restricted Delta to selling the NFR strips to DME providers, but Shaya refused, saying that it "stinks of a cover-up." (*Id.* at PgID 29–30, ¶¶ 98–101.) The reason that Northwood wanted Shaya to sign the contract, according to a text from Dickstein to Shaya, was to make Northwood feel that it had "an argument for . . . being compliant to the contract." (*Id.* at PgID 30, ¶ 101.) Shaya continued to refuse to sign, <u>but</u> he passed the contract along to MSSI, which returned it to Northwood with an illegible signature. (*Id.* at PgID 31, ¶ 102.)

Roche claims to have lost $84 million in profits and millions more in unwarranted rebates on NFR strips sold in retail markets as a result of this scheme. (*Id.* at PgID 37, ¶¶ 127–28.) Roche also alleges that Shaya made $8 million in personal profits. (*Id.* at PgID 27, ¶ 90.)

## B. Facts as alleged in Shaya's Third-Party Complaint

In 2014, Shaya, Fasse, and Dickstein began discussing Northwood purchasing test strips from Roche for resale to Olympus. (ECF No. 13, Third-Party

Complaint, PgID 110, ¶ 7.) Dickstein and Fasse told Shaya that Northwood would try to amend the contract between Binson's and Roche to allow Northwood to buy strips directly and then resell them to Olympus. (*Id.* at PgID 111, ¶ 8.) During these discussions, Fasse and Dickstein were aware that Olympus was not a DME provider. (*Id.* at PgID 112, ¶ 13.) Based on these negotiations, they executed a contract between Olympus and Northwood on May 2, 2014. (*Id.* at PgID 111, ¶ 9.)

On June 30, 2014, Dickstein emailed Shaya and said, in part, "we should be good to go on our end." (*Id.* at PgID 114, ¶ 24.) Later, on July 10, 2014, Dickstein texted Shaya, and said, in part, "[w]e got approval and are good to move forward." (*Id.* at ¶ 25.) Shaya alleges that these communications from Dickstein to Shaya indicated that Northwood had received approval from Roche to sell strips to Olympus, and had amended its agreement with Roche to reflect that approval. (*Id.* at PgID 111, 114. ¶¶ 10, 24–25.) Shaya further alleges that Northwood, Fasse, and Dickstein did not tell Shaya that Northwood's contract with Roche did not allow the sale of strips to Olympus. (*Id.* at PgID 112, ¶ 15.)

Northwood and Olympus then began transacting under the contract—Northwood purchased strips from Roche and resold them to Olympus. (*Id.* at PgID 111, ¶ 11.) Fasse and Dickstein remained aware that Olympus was not a DME distributor and that Olympus was not reselling the strips to individual patients. (*Id.* at PgID 112, ¶¶ 13–14.) In January of 2015, Mankopf and Shaya dissolved

Olympus, and Shaya and his new partner Gladys formed Delta, which took over the purchasing of strips from Northwood. (*Id.* at PgID 111, ⁋ 12.) Fasse and Dickstein were also aware that Delta was not a DME distributor and was not reselling strips to individual patients. (*Id.* at PgID 112, ⁋⁋ 13–14.)

In late September 2015, Roche stopped selling strips to Northwood and began investigating Northwood's conduct. (*Id.* at ⁋ 16.) This led to Roche suing Northwood, Binson's, Shaya, and Shaya's companies in the United States District Court for the Southern District of Indiana, and, eventually, in this Court. (*Id.* at PgID 112, 113 ⁋⁋ 17, 19–20.) Roche settled the claims in the Indiana litigation and released its claims against all of the defendants other than Shaya in this case. (*Id.* at PgID 112, 113, ⁋⁋ 18, 21.) Shaya has incurred costs and attorney's fees defending himself here and in Indiana, and he may be required to pay damages to Roche. (*Id.* at PgID 114, ⁋⁋ 29–30.)

## III.    STANDARDS OF REVIEW

### A. Shaya's Motion for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c) Regarding Roche's Complaint

"Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are analyzed under the same de novo standards as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)). Indeed, "the legal standards for

16

adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same." *Lindsay v. Yates*, 498 F.3d 434, 437 n. 5 (6th Cir. 2007). Therefore, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Poplar Creek Dev. Co. v. Chesapeake*, 636 F.3d 235, 240 (6th Cir. 2011) (citation omitted). The Sixth Circuit has explained that:

> Although a complaint need not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). And, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1949).

*Reilly v. Vadlamudi*, 680 F.3d 617, 622–23 (6th Cir. 2012).

Federal Rule of Civil Procedure 9(b) imposes a "more demanding" pleading standard than the "liberal notice pleading standard which governs most cases" on allegations of fraud or mistake. *United States ex. Rel SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008). It requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake" although it allows "conditions of a person's mind" to be alleged generally. Fed. R. Civ. P. 9(b). Thus, "a plaintiff must 'allege the time, place, and content of the alleged

misrepresentation . . . the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Id.* at 504 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys. Inc.*, 501 F.3d 493, 504 (6th Cir. 2007)). Rule 9(b) discourages " 'fishing expeditions and strike suits' which appear more likely to consume a defendant's resources than to reveal evidence of wrongdoing" and protect defendants against "unwarranted damage to [their] reputation[s]." *Id.*

The requirements of Rule 9(b) however, "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plaint statement of the claim' made by 'simple, concise, and direct allegations.' " *Id.* at 503. Ultimately, the purpose of Rule 9(b) is the same as the purpose of Rule 8—"ensuring that a defendant is provided with at least the minimum degree of detail necessary to begin a competent defense." *Id.* at 504. So, a complaint that pleads enough detail to allow the defendant to prepare a responsive pleading is generally acceptable under Rule 9(b). *Id.*

**B.    Third-Party Defendants' Motion to Dismiss Shaya's Complaint Under Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true,

and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). Sixth Circuit "precedent instructs that, for a complaint to survive such motions, it must contain 'either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.' " *Buck v. City of Highland Park, Michigan*, 733 F. App'x 248, 251 (6th Cir. 2018) (quoting *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013)). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.' " *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56. The Sixth Circuit has reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *See Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.").

## IV.     ANALYSIS

### A. Shaya's Motion for Judgment on the Pleadings

Defendant Shaya argues that Roche's complaint fails to state a claim upon which relief can be granted for several reasons. Regarding Roche's fraud and fraud in the inducement claims, Shaya argues that Roche fails to plead that Shaya made a

misrepresentation of material fact because Shaya never communicated directly with Roche and because the lists of health plans/insurers provided by Shaya to Dickstein were not, in themselves, false. (ECF No. 24, Shaya's Motion, PgID 161–64.) Regarding Roche's aiding and abetting fraud claim, Shaya argues that Roche fails to plead facts showing that Shaya had actual knowledge of the terms of the Northwood-Roche contract or that Shaya substantially assisted the fraud committed by Northwood and others. (*Id.* at PgID 165–68.) On Roche's civil conspiracy to commit fraud claim, Shaya argues that Roche fails to plead the existence of an agreement between Shaya and the dismissed Northwood defendants and that Roche's failure to properly plead facts supporting the underlying torts causes its civil conspiracy claim to fail. (*Id.* at PgID 168–69.) These arguments, as explained below, are unavailing.

Shaya also argues that Roche fails to state a claim for tortious interference or for unjust enrichment. (*Id.* at PgID 169–75.) He says that there was no tortious interference because Shaya's act of providing lists of health plans/insurers was motivated by legitimate business interests and was therefore not improper. (*Id.* at PgID 173–75.) This argument fails under current Michigan law.

Shaya also alleges that Roche's unjust enrichment claim fails because there are contracts governing the subject matter and because Roche does not allege that Shaya received a benefit directly from Roche. (*Id.* at PgID 169–73.) Roche has

pled sufficient facts supporting a claim of unjust enrichment and therefore the Court will not dismiss this claim.

Finally, Shaya argues that Plaintiff Roche Diabetes Care, Inc. is not a real party in interest because it only took the U.S. commercial diabetes business over from Plaintiff Roche Diagnostic Corporation in November of 2015, after sales to Northwood had been terminated. (*Id.* at PgID 175–76.) Shaya does not cite any law in support of this argument in his brief supporting his Motion to Dismiss, and in his reply brief he makes one conclusory reference to Federal Rule of Civil Procedure 8(a)(2).[1] Because this argument is undeveloped, this Court can go so far as to consider it waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") Roche has also made clear that Roche Diabetes Care, Inc. claims that it suffered damages after it took over the U.S. commercial diabetes business by paying unwarranted rebates to pharmacies that sold NFR strips that Northwood and Shaya's companies diverted into the retail market. (*See* ECF No. 26, Roche's Response, PgID 254–55.) Thus,

---

[1] Rule 8(a)(2) merely requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Rule 17(a) establishes the requirement that actions must be prosecuted in the name of the real party in interest, yet Shaya does not refer to it or any cases interpreting it.

the Court rejects Defendant Shaya's invitation to dismiss the claims brought on behalf of Roche Diabetes Care, Inc.

### 1.    Fraud and Fraudulent Inducement

Michigan law establishes these elements of fraud and fraud in the inducement:

> (1)    the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance on it; and (6) the plaintiff suffered damage.

*Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 477 (Mich. App. 2003). The difference between fraud and fraud in the inducement is that fraud "must be predicated on a statement relating to a past or an existing fact" and fraud in the inducement "occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich. App. 636, 639 (Mich. App. 1995).

Roche alleges that Shaya defrauded Roche by providing the lists of health plans/insurers to Dickstein, who he knew would pass them on to Roche, which relied upon the lists, first when it agreed to amend its contract with Binson's and Northwood to eliminate the rebate and sales tracing mechanism, and then when it

agreed to increase Northwood's line of credit and allowed it to buy even greater numbers of strips. (ECF No. 1, Complaint, PgID 38–40, ¶¶ 130–33, 135–37.) Shaya contends that Roche's Complaint fails to establish the first, second, and fifth elements of fraud because the complaint fails to allege that the lists of health plans/insurers that Shaya provided were themselves false, and because the complaint fails to allege that Shaya made any representations directly to Roche and therefore Shaya did not make any representations to Roche upon which Roche relied. (ECF No. 24, Shaya's Motion, PgID 161–64.)

The factual allegations in Roche's Complaint, along with the reasonable inferences that the facts support, establish that Shaya made a false representation. In Michigan, "[a] partial truth, as well as a truth taken out of context and used as bait to defraud and deceive, is an actionable false representation." *Nationwide Motorist Ass'n of Mich., Inc. v. Nationwide Motorist Ass'n, Inc.*, 273 F. Supp. 875, 882 (W.D. Mich. 1976). In *Nationwide*, the "truth taken out of context" to which the court was referring was a "boast" by defendants that its association was the "second largest motor club association in the world." *Id.* The statement, which was part of defendant's campaign to sell the plaintiffs a franchise, was literally true but it disguised the fact that the association was actually in competition with "six other larger organizations." *Id.* In other words, the statement was a half-truth, which, in

Michigan, is "considered to be [a] concealment of facts and, therefore, [a] misrepresentation[]." *People v. Atkins*, 397 Mich. 163, 182 (1976).

Here, although "Roche does not allege that the two lists of health plans were inaccurate," Roche does allege facts that show that the lists, in context, were misrepresentations. (ECF No. 24, Shaya's Motion, PgID 163.) Roche cites Shaya's testimony that the first list he prepared was "something to give to Roche to help in [Northwood's] negotiations," (ECF No. 1, Complaint, PgID 57, ¶ 57.) Roche alleges that Shaya included the caveat "I don't know if they are a provider of diabetes for all of them" when he emailed Dickstein the first list, and cautioned Dickstein to not send "a non diabetes plan." (*Id.* at PgID 17, ¶ 53.) Roche further contends that, when Shaya prepared the second list of insurers, he "knew that this list of insurers had no connection to the test strip business he was doing with the Binson's Defendants" but would be provided to Roche "in order to induce Roche to continue selling NFR test strips to Northwood." (*Id.* at PgID 21, ¶¶ 69–70.) These factual allegations show that Shaya prepared the lists knowing that his companies would not sell and were not selling the strips they purchased from Northwood to those insurers' patients. The reasonable inference, then, is that Shaya prepared these lists and omitted the fact that he was not conducting business with the listed insurers in order to misrepresent the ultimate buyers of the NFR

strips. Under Michigan law, these lists containing only part of the truth were material misrepresentations. *Cf. Nationwide*, 273 F. Supp. at 882.

Roche adequately pleads reliance on Shaya's misrepresentations even though the misrepresentations were not made directly to Roche. *See Nernberg v. Pearce*, 35 F.3d 247, 250 (6th Cir. 1994) ("It is generally accepted that a plaintiff is not required to prove direct reliance on a fraudulent misrepresentation to state a claim for fraud."). A person is liable for an indirect misrepresentation "where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him." *Id.* at 251 (quoting *Cormack v. Am. Underwriters Corp.*, 94 Mich. App. 379 (Mich. App. 1979)). Here, Shaya prepared both lists of health plans/insurers in response to requests from Dickstein for help responding to Roche's requests for information about Northwood's sales of the NFR strips. (*See* ECF No. 1, Complaint, PgID 16–17, 21–23, ¶¶ 52–53, 68–71, 73.) In context, it is reasonable to infer that Shaya prepared the lists of health plans/insurers and omitted the fact that his companies were not doing any business with those insurers with the knowledge and intent that the lists were going to be sent to Roche in order to deceive it into (a) amending its contract, and (b) continuing sales of strips to Northwood.

The allegations in Roche's Complaint are sufficient to state a claim for fraud and fraud in the inducement against Shaya. Therefore, Shaya's Motion for Judgment on the Pleadings (ECF No. 24) is denied on this claim.

## 2. Aiding and Abetting Fraud

The Sixth Circuit has held that, given the opportunity, the Michigan Supreme Court "would adopt the approach of aiding and abetting as set forth in § 876(b) of the Restatement (Second) of Torts." *El Camino Resources Ltd. v. Huntington Nat'l Bank*, 712 F.3d 917, 922 (6th Cir. 2013). Under this approach, an aiding and abetting claim requires proof of "(1) knowledge of wrongful conduct by the aider/abettor; and (2) substantial assistance of the wrongful conduct by the aider/abettor." *Id.*

First, to satisfy the knowledge prong, the plaintiff must show actual knowledge of the wrongful conduct, but that knowledge "may be proven by circumstantial evidence." *Id.* Circumstances that show that the purported aider/abettor had a "strong suspicion of wrongdoing," such as evidence that the purported aider/abettor was investigating the tortfeasor, are insufficient to prove actual knowledge—the aider/abettor must know of the specific wrongdoing. *Id.* at 923. The aider/abettor must also have the same degree of scienter as the person committing the underlying tort. *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1346 (E.D. Mich. 2011).

Roche pleads sufficient facts to show that Shaya had actual knowledge of the fraud that the Northwood Defendants were perpetrating against Roche. Roche describes how its NFR strips are packaged differently than its retail strips, with warnings on the label in "easy-to-read, bolded black lettering on a yellow background" that the strips are not for sale in retail outlets. (ECF No. 1, Complaint, PgID 9, ℙ 28.) Further, "[i]t is well understood in the medical supply industry that DME products may only be sold through DME channels." (*Id.* at PgID 12, ℙ 38.) These facts suggest that when Shaya agreed to buy NFR strips from Northwood and sell them to MSSI, which would distribute the strips in the retail market, Shaya should have known that Northwood was not being truthful in its dealings with Roche. These facts also undermine Shaya's argument that he was not aware of the terms of Northwood's contract with Roche because he would not have needed to know the specific terms of the contract to be aware that NFR strips should not be sold in retail markets. (*See* ECF No. 24, Shaya's Motion, PgID 166–67.)

Shaya's behavior, as alleged in Roche's Complaint, is more consistent with actual knowledge of Northwood's efforts to deceive Roche than with merely strong suspicion of wrongdoing. *Contra El Camino*, 712 F.3d at 923 (finding no actual knowledge where a bank investigated suspicious activity by a customer but had no knowledge of the customer's fraudulent scheme). On May 16, 2014, Dickstein asked Shaya to send him "some language" for Northwood's agreement with Roche

to allow Northwood to sell strips "without needing the end user tracings." (*Id.* at PgID 15, ¶ 47.) Shaya was therefore aware that Northwood was trying to circumvent the requirement of submitting sales tracings to Roche. Then, on two different occasions Dickstein asked Shaya for help preparing responses to inquiries from Roche. (*See id.* at PgID 16–17, 21–23, ¶¶ 51–53, 68–71, 73.) Instead of becoming suspicious of Northwood based on its requests for information that was irrelevant to their transactions, Shaya simply complied with the requests by sending lists of health plans or insurers that may or may not cover test strips as a DME benefit. (*Id.*) Finally, when communicating with Dickstein about Northwood's orders of strips from Roche, Shaya, on more than one occasion, cautioned Dickstein to order fewer boxes from Roche in order to avoid raising flags at Roche. (*See id.* at PgID 24, ¶¶ 80–81.) Shaya's concern with avoiding flags is consistent with knowledge of the fraud, rather than ignorance or suspicion. Roche successfully pleads actual knowledge against Shaya.

Second, to satisfy the substantial assistance prong of aiding and abetting a tort, the plaintiff must show that the aider/abettor's "encouragement or assistance was a substantial factor in causing the tort." *Fremont*, 811 F. Supp. 2d at 1347 (quoting *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000)). In other words, the plaintiff must show that the aider/abettor's conduct was both the but-for and proximate cause of the tort. *Id.* In *Aetna*, the Sixth Circuit,

applying § 876(b) of the Restatement (Second) of Torts in the context of Ohio common law, found substantial assistance when a bank's loan to the head of a construction company allowed him to temporarily inflate the assets of the construction company in order fraudulently induce the plaintiff to issue bonds for the company's projects. 219 F.3d at 537. The bank's assistance was crucial because it allowed the fraudster "to 'verify' to [the defendant] that he had complied with its first funding request, thereby establishing a vital and initial level of credibility." *Id.* Thus, providing information that bolsters the credibility of a party engaging in fraud qualifies as substantial assistance.

Here, Roche's allegations that Shaya generated lists of health plans/insurers that Northwood used to induce Roche into amending its contract and selling large volumes of NFR strips to Northwood without requiring sales tracings establish substantial assistance. (*See* ECF No. 1, Complaint, PgID 16–17, 21–23, ¶¶ 51–53, 68–71, 73.) Just as the loan in *Aetna* established "a vital and initial level of credibility," Shaya's first list of health plans gave the appearance of credibility to Northwood's assertion that it had access to new business through commercial DME insurance companies. (*See id.* at PgID 16, ¶ 50); 219 F.3d at 537. Further, both times that Shaya prepared these lists, it was in direct response to requests for that information from Northwood by Roche. (*See id.* at PgID 16–17, 21–23, ¶¶ 51, 55, 68–70, 73.) It is reasonable to infer, then, that if Northwood had been unable to

provide the requested information, Roche would not have relied on Northwood's otherwise unsupported claims of access to new customers. So, contrary to Shaya's contention that "given the weight of the Dismissed Defendants' fraudulent activity, [Shaya's actions] do[] not as a matter of law constitute 'substantial assistance,' " Roche's allegations suggest that Shaya's assistance was essential to the fraud perpetrated by Northwood. (ECF No. 24, Shaya's Motion, PgID 168.)

Roche therefore states a valid claim for aiding and abetting fraud, and Shaya's Motion for Judgment on the Pleadings is denied on this count.

### 3.    Civil Conspiracy

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313 (Mich. App. 1992). It "requires proof of an intentional agreement," *Fremont*, 811 F. Supp. 2d at 1341, but the agreement need not be express. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Rather, the plaintiff must show that "there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.* If the "circumstances, acts and conduct of the parties establish an agreement in fact" the existence of an agreement may be inferred. *Fremont*, 811 F. Supp. 2d at 1341.

Finally, the plaintiff must prove "a separate, actionable, tort." *Early Detection Center, P.C. v. New York Life Ins. Co.*, 157 Mich. App. 618, 632 (Mich. App. 1986).

Because the Court is allowing Roche's fraud claims against Shaya to proceed, there is a separate, actionable tort underlying this claim. *Contra Admiral Ins. Co.*, 194 Mich. App. at 358–59 ("Because Admiral has failed to state any tortious action, its conspiracy action must also fail."). The only remaining question is whether Roche alleges facts that show an agreement between Shaya, Fasse, Dickstein, Binson, and Northwood. *See Fremont*, 811 F. Supp. 2d at 1341.

Roche alleges that Northwood and Shaya's company Olympus signed a contract under which Northwood agreed to sell Roche's NFR strips to Olympus which would then resell them to MSSI. (ECF No. 1, Complaint, PgID 14, ¶¶ 43–44.) Given the common knowledge that NFR strips are not intended for sale in the retail market, Shaya's act of signing this contract suggests agreement to participate in a fraudulent scheme. (*Id*. at PgID 12, ¶ 38.) Further, the same circumstantial allegations that support an inference that Shaya knew that Northwood was defrauding Roche also support an inference that Shaya agreed to participate in the fraudulent scheme. Finally, Roche's allegations that Shaya communicated extensively with Dickstein about how to structure Northwood's purchases to avoid raising flags at Roche also support an inference of agreement. (ECF No. 1,

Complaint, PgID 24, ¶¶ 79–81.) Therefore, unlike the plaintiff in *Fremont*, who failed to allege any acts by the individual defendant that tended to show agreement, Roche alleges several acts which tend to show agreement. 811 F. Supp. 2d at 1342.

Roche successfully alleges a claim for civil conspiracy, and therefore Shaya's Motion for Judgment on the Pleadings is denied on this claim.

### 4. Unjust Enrichment

Unjust enrichment is an equitable claim. *Landstar Express Am., Inc. v. Nexteer Auto. Corp.*, 319 Mich. App. 192, 204 (Mich. App. 2017). If the plaintiff establishes "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant . . . the law will imply a contract in order to prevent unjust enrichment." *Belle Isle*, 256 Mich. App. at 478. The Michigan Supreme Court has stated that "the process of imposing a 'contract-in-law' or a quasi-contract to prevent unjust enrichment is an activity which should be approached with some caution." *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546 (1991).

Because unjust enrichment is a quasi-contract remedy, if an express contract covering the exact same subject matter exists, the law will not imply a contract and there is no claim for unjust enrichment. *See Belle Isle*, 256 Mich. App. at 478–79 (denying plaintiff lessee's unjust enrichment claim for the costs of improvement because the lease "expressly contemplated and covered capital improvements in

lieu of rent"). In other words, where the plaintiff can be made whole through a breach-of-contract remedy the law will not imply a contract and change the parties' bargained-for allocation of expenses and risks. *See id.* at 479 n. 6 ("[P]laintiff included the cost of improvements as an element of damages in its claim for breach of lease.") Where the defendant has engaged in inequitable conduct and a breach-of-contract remedy does not address the damage caused by that inequitable conduct, a court may appropriately imply a contract. *Compare, Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 196–97 (Mich. App. 2006) (implying a contract between a general contractor and its subcontractor's material suppliers when "defendant [the general contractor] was necessarily a party to the decision to use and retain the materials without paying plaintiffs [the materials suppliers]") *with Landstar Express*, 319 Mich. App. at 205–06 (refusing to imply a contract where "the benefit defendants received . . . was nothing more than what all the parties contemplated" when negotiating their respective contracts).

Here, Roche alleges that Shaya obtained a monetary benefit (approximately $8 million) from Roche by engaging in the scheme at issue, and that it would be unjust to allow Shaya to retain that money. (ECF No. 1, Complaint, PgID 27, 45, ¶¶ 90, 166–68.) Shaya argues that the express contracts between Roche and Northwood and between Northwood and Olympus/Delta control the outcome so there is no need to imply a contract. (ECF No. 24, Shaya's Motion, PgID 170–72.)

This is a difficult question. On the one hand, Shaya correctly argues that the Northwood-Roche contract expressly governs the subject of sales of NFR strips to non-DME entities, which suggests that, like the plaintiff in *Landstar Express*, Roche should be seeking damages from Northwood, the entity with which it had a contract, not Shaya, whose companies did not breach their own contract with Northwood. *See* 319 Mich. App. at 206 ("While plaintiff was certainly deprived of the money it was due. . . that duty to pay fell to Contech, not defendants.") On the other hand, Shaya's companies' contract with Northwood on the subject of NFR strips did not simply decide who was responsible for paying Roche for the strips, as the defendant's contract in *Landstar Express* did, but the existence of the contract itself is alleged to be part of the inequitable scheme at issue. *See id.* at 205–206 ("[t]he benefit defendants received . . . was nothing more than what *all* the parties contemplated") (emphasis added). In fact, Shaya's alleged conduct seems more analogous to the conduct of the general contractor in *Morris Pumps*, whose decision to use and retain materials that had not been paid for was not "completely innocent and without knowledge." 273 Mich. App. at 197. Finally, it is undisputed that Roche and Shaya's companies were never parties to a contract, so Roche cannot recover damages from Shaya via a breach-of-contract remedy. *Contra Belle Isle*, 256 Mich. App. at 478–79. Under these facts, Roche successfully alleges an unjust enrichment claim.

Shaya argues that unjust enrichment requires the defendant to have received a benefit directly from plaintiff, which means that Roche cannot recover from Shaya who received all of his benefits from Roche indirectly, through Northwood. (ECF No. 24, Shaya's Motion, PgID 172–73.) It is an open question whether Michigan law requires the benefit to have been conferred directly by the plaintiff to the defendant, but the case law appears to lean in favor of allowing claims based on indirect benefits. *See Miller v. MSX-IBS Holdings, Inc.*, No. 16-cv-10596, 2016 WL 4138238 at *8 (E.D. Mich. Aug. 4, 2016) ("Michigan law does not require a direct link between defendants' benefit and plaintiffs' detriment."). In fact, courts that have looked closely at this question have found that the direct or indirect nature of the benefit is simply a factor to consider in determining whether it would be unjust for the defendant to retain the benefit.

The *Miller* court held that the benefit need not be direct but that the court must determine "whether plaintiffs have shown that their detriment and defendants' benefit 'are related and flow from the challenged conduct.' " No. 16-cv-10596, 2016 WL 4138238 at *8. In support, the *Miller* court cited *In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000). There, the court said, "careful examination of the cited authority shows that the courts dismiss such claims [of unjust enrichment] only where the plaintiffs fail to allege facts showing that they have bestowed some sort of benefit upon the

defendant *that the defendant ought not keep in equity and good conscience*." 105 F. Supp. 2d at 671 (emphasis added). Similarly, the *Morris Pumps* court noted that "where a third person benefits from a contract entered into between two other persons, *in the absence of some misleading act by the third person*, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person." 273 Mich. App. at 196 (emphasis added). The implication is that where the third party benefits by virtue of taking a misleading action, there may be a right of restitution against that party because, in that context, it would be unjust for the third party to retain its indirect benefit.

In this case, Roche alleges that Shaya obtained an indirect benefit from Roche through inequitable and misleading actions. In these circumstances, the Court concludes that it would be unjust for Shaya to retain the benefit and denies Defendant Shaya's Motion for Judgment on the Pleadings on this count.

### 5. Tortious Interference

To plead a claim for tortious interference with a contractual relationship, a plaintiff must plead facts showing, "(1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant." *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 95 (Mich. App. 1989). To show the third element, the plaintiff must show that the defendant either "committed an act that was so wrongful that [the defendant] had no justification whatsoever for committing that act, and did so

with malice and the intent to induce [the third party] to breach [its] contracts . . ., or that [the defendant] committed a lawful act with malicious intent to instigate [the third party] to breach [its] contracts." *Knight Enterprises v. RPF Oil Co.*, 299 Mich. App. 275, 280 (Mich. App. 2013).

The question of whether the act committed by the defendant was justified has "[n]o categorical answer" and it is "usually held that this question is one for the jury." *Wilkinson v. Powe*, 300 Mich. 275, 283 (1942). At one point, the Michigan Court of Appeals endorsed a per se rule that conduct motivated by "legitimate personal and business reasons" was shielded from liability for tortious interference. *See Christner v. Anderson, Nietzke & Co.*, 156 Mich. App. 330, 347–49 (Mich. App. 1986). That rule, however, has since been replaced with a balancing test where the court must weigh the defendant's motive in addition to "(1) the nature of the defendant's conduct, (2) the nature of plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Jim-Bob, Inc.*, 178 Mich. App. at 96–97.

After considering those factors, if there is "enough doubt about the propriety of [the defendant]'s conduct" a court should leave the question of justification for the jury. *Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d 416, 429 (6th Cir. 1994) (finding summary judgment inappropriate where there was significant doubt

as to whether a company's employee recruiting tactics were justified). In *Jim-Bob, Inc.*, for instance, the court found a jury question of justification where the defendant was aware of the existence of a possibly-valid five-year lease between the plaintiffs and a third-party landlord and, with no intention of honoring the lease agreement, the defendant offered a large sum of money to the third-party to buy the property. 178 Mich. App. at 97–98. The defendant was motivated by legitimate business purposes, but in the context of the case the jury was still entitled to find that its actions were not justified. *Id.*

Roche pleads that (1) it had a contract with Binson's and Northwood and (2) that Northwood breached that contract by selling NFR strips to Shaya's companies. (ECF No. 1, Complaint, PgID 46, ¶¶ 169–172.) The only question is whether Roche pleads sufficient facts to show that Shaya instigated the breach without justification. *Cf. Jim-Bob, Inc.*, 178 Mich. App. at 96–97. As explained above, Roche alleges that Shaya negotiated a contract with Northwood in which he agreed to have his company, Olympus, buy Roche's NFR strips from Northwood and then resell them to MSSI. (ECF No. 1, Complaint, PgID 14, ¶¶ 43–44.) Given the common knowledge that NFR strips are not to be sold in the retail market, these facts suggest that Shaya was aware that Northwood would have to violate any contract it had with Roche to participate in the scheme. (*Id.* at PgID 12, ¶ 38.)

Roche also alleges that Dickstein emailed Shaya indicating that he was having difficulty "trying to figure out how to make this work within the framework of our manufacturing partners [sic] contracts." (*Id.* at PgID 15, ¶ 47.) Shaya could have understood that email to mean that Dickstein was trying to figure out how to make sales to Olympus work without violating Binson's and Northwood's contracts with Roche, but Shaya also could have understood the email, in context, to mean that Dickstein was still figuring out how to breach those contracts without being caught. Because the Court must make all reasonable inferences in favor of the nonmoving party, this allegation supports Roche's argument that Shaya's participated in planning and executing a scheme in which Northwood had to breach its contract with Roche. Therefore, Roche adequately pleads facts supporting a claim for tortious interference against Shaya. The Court denies Shaya's Motion for Judgment on the pleadings on this count.

In sum, the factual allegations in Roche's Complaint are adequate to state claims for relief on all counts. The Court denies Defendant Christopher Shaya's Motion for Judgment on the pleadings on all counts.

### B.     Third-Party Defendants' Motion to Dismiss Third-Party Complaint

In addition to Shaya's Motion for Judgment on the Pleadings, the Court also has before it Third-Party Defendants Fasse's, Dickstein's, and Northwood's

Motion to Dismiss Christopher Shaya's Third-Party Complaint. (ECF No. 25.) In it, Third-Party Defendants urge the Court to abstain from exercising jurisdiction over the Third-Party Complaint based on the doctrine of abstention announced in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). (ECF No. 25, Motion to Dismiss, PgID 204–10.) The facts of this case, however, are not so exceptional as to justify abstention. However, the Court will dismiss Shaya's Third-Party Complaint because it fails to state claims for fraud, silent fraud, and common law indemnification upon which relief can be granted. Therefore, the Court grants Third-Party Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

### 1. Fraud

As indicated above, under Federal Rule of Civil Procedure 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake" although the plaintiff may allege the "conditions of a person's mind" generally. More specifically, "the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Llewllyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 780 (E.D. Mich. 2014). These requirements will not be strictly enforced where the complaint adequately places the defendant on notice of the particular misconduct alleged. *See*

*id.* (allowing several fraud claims to go forward where complaint "exhaustively" detailed allegations of a scheme and the particular role each plaintiff played in it even though complaint was somewhat confusing). Again, in Michigan, the elements of fraud are:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance on it; and (6) the plaintiff suffered damage.

*Belle Isle*, 256 Mich. App. at 477.

Shaya's sparse Third-Party Complaint alleges that either Dickstein or Fasse told him that Northwood would amend the contract between Binson's and Roche to allow Northwood to purchase strips from Roche and resell them Olympus, and that, based on this representation, Shaya executed a contract with Northwood on behalf of Olympus. (ECF No. 13, Third-Party Complaint, PgID 111, ¶¶ 8–9.) Later, either Fasse or Dickstein informed him that the agreement between Binson's, Northwood and Roche had been amended, prompting them to begin conducting business pursuant to their contract. (*Id.* at PgID 111, ¶¶ 10–11.) Shaya identifies only two specific representations—first that, on June 30, 2014 Dickstein said that Northwood was "good to go" and that on July 10, 2014, Dickstein said that "we got approval and are good to move forward." (*Id.* at PgID 114, ¶¶ 24–25.)

Shaya's first allegation, that at some point in 2014 either Fasse or Dickstein advised him that Northwood would try to amend the contract with Roche, lacks the specificity required for fraud claims under Rule 9(b) and Rule 12(b)(6) because it does not identify the speaker, provide any context about when and where the statement occurred other than it happened during the course of "discussions" between Shaya, Fasse and Dickstein, and it does not explain how the statement was fraudulent. *Contra Llewllyn-Jones*, 22 F. Supp. 3d at 781 (finding that an exhaustive complaint detailing a scheme to defraud plaintiffs that included descriptions of "each defendants' alleged role" in the scheme properly stated a claim). Further, the principal Complaint in this case makes clear that Northwood did amend the contract, and, although the amendment did not permit sales to Olympus, it did enable Northwood to sell strips without submitting sales tracings. (ECF No. 1, Complaint, PgID 18, ¶¶ 60–61.) Therefore, it is not clear that this vaguely alleged statement was a misrepresentation.

Shaya's other allegations, that Dickstein texted and emailed him statements that implied that Northwood had gotten approval from Roche to sell strips to Shaya's companies, specifically identify the speaker, the date, and some of the contents of the communication, but these allegations are still insufficient to support a claim of fraud. (ECF No. 13, Third-Party Complaint, PgID 114, ¶¶ 24–25.) Even though these allegations suggest that Dickstein made a false representation of fact,

they are insufficient because Shaya fails to allege facts showing any of the other elements of fraud. Paragraphs 27 and 28 of the Third-Party Complaint, in which Shaya attempts to plead the elements of intent and reliance are "bare assertions" that amount only to a "formulaic recitation of the elements" of a fraud claim. *Iqbal*, 556 U.S. at 681. As such, these allegations are not entitled to the presumption of truth. *Id.* Without these allegations, Shaya's Third-Party Complaint is devoid of facts that show that Shaya reasonably relied on the alleged misrepresentation and therefore fails to plausibly suggest an entitlement to relief.

### 2.    Silent Fraud

Michigan courts have recognized that silence can constitute actionable fraud if it "occurred under circumstances where there was a legal duty of disclosure." *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 29 (Mich. App. 1998). It is "essentially the same" as fraud "except that it is based on a defendant suppressing a material fact that he or she was legally obligated to disclose." *Alfieri v. Bertorelli*, 295 Mich. App. 189, 193 (Mich. App. 2012). The duty to disclose "will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Hord v. Envtl. Research Inst. of Mich.*, 463 Mich. 399, 412–13 (2000) (denying claim based on silent fraud where there was no evidence that plaintiff requested the information alleged to have been suppressed). In *Alfieri*, for

instance, the court found a legal duty to disclose where there was evidence that "the plaintiffs made direct inquiries of defendants about the condition of the property." 295 Mich. App. at 194.

Shaya alleges that Northwood, Fasse and Dickstein committed silent fraud by failing to inform him that Northwood's contract with Roche barred it from selling strips to Olympus and Delta. (ECF No. 13, Third-Party Complaint, PgID 115–16, ¶¶ 31–35.) Shaya does not, however, allege any facts that show that any of the Third-Party Defendants had a duty to disclose. He does not, for instance, allege that he asked whether Northwood's contract permitted the sale of strips to his companies. *Cf. Hord*, 463 Mich. at 413. Therefore, Shaya's Third-Party Complaint fails to state a claim for silent fraud and the Court dismisses this count.

### 3. Common Law Indemnity

Common law indemnity is "an equitable doctrine that shifts the entire burden of judgment from one tortfeasor who has been compelled to pay it, to another whose active negligence is the primary cause of the harm." *St. Luke's Hosp. v. Giertz*, 458 Mich. 448, 453 (1998). "It has long been held in Michigan that the party seeking indemnity must plead and prove freedom from personal fault." *Langley v. Harris Corp.*, 413 Mich. 592, 597 (1982). This requires proof that the party seeking indemnity did not commit any "active or causal

negligence"—in other words, proof that the party seeking indemnity did not breach "a direct duty owed to another" which proximately caused injury. *Id.*

At the pleading stage of litigation, courts are directed to look to the principal complaint to determine whether that complaint alleges active negligence on the part of the party seeking indemnification. *Swindlehurst v. Resistance Welder Corp.*, 110 Mich. App. 693, 698 (Mich. App. 1981). As detailed above, Roche's complaint alleges that Shaya committed fraud, aided and abetted fraud, engaged in civil conspiracy, was unjustly enriched, and that he tortiously interfered with Roche's contract with Northwood and Binson's. (*See generally*, ECF No. 1, Complaint.) These are claims of active wrongdoing, and if Shaya is found liable on any of these counts, that liability will not have arisen solely "by operation of law." *Langley*, 413 Mich. at 598. Therefore, Shaya is not free of active fault and cannot bring a claim of indemnity against Northwood, Fasse or Dickstein.

Shaya fails to state a claim on any of the claims for relief in his Third-Party Complaint, so the Court dismisses it in its entirety.

## V.     CONCLUSION

The Court denies Defendant Christopher Shaya's Motion for Judgment on the Pleadings (ECF No. 24) on all counts of Plaintiff Roche's Complaint, grants Third-Party Defendants Northwood, Inc.'s, Donnie F. Dickstein's, and Kenneth G.

Fasse's Motion to Dismiss (ECF No. 25) and dismisses Third-Party Plaintiff

Christopher Shaya's Third-Party Complaint (ECF No. 13) with prejudice.

IT IS SO ORDERED.


Dated:  December 3, 2019                    s/Paul D. Borman
                                            Paul D. Borman
                                            United States District Judge