UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROCHE DIAGNOSTICS CORP, and
ROCHE DIABETES CARE, INC

     Plaintiffs,

v.

CHRISTOPHER F. SHAYA

     Defendant.

_____/

Case No. 19-cv-10264

Paul D. Borman
United States District Judge

Elizabeth A. Stafford
United States Magistrate Judge

**OPINION AND ORDER DENYING DEFENDANT CHRISTOPHER F.
SHAYA'S MOTION FOR SUMMARY JUDGMENT (ECF No. 76.)**

I.   **Procedural History**

This case involves an alleged scheme by Defendant Christopher Shaya to use

his companies, Olympus Global, LLC (Olympus) and Delta Global, LLC (Delta), to

purchase not-for-retail-sale (NFR) diabetes test strips manufactured by Plaintiff

Roche Diagnostics Corp. from Northwood, Inc. (Northwood) and resell them in

retail markets at a significant markup. (*See generally*, ECF No. 1, Complaint.)

Roche Diagnostics Corp., and its successor in interest, Roche Diabetes Care,

Inc. (together, "Roche") initially sued everyone involved in this scheme in the

Southern District of Indiana for breach of contract, fraudulent inducement, fraud,

and similar claims. *Roche Diagnostics Corp. v. Bison's Hosp. Supplies*, No 1:17-cv-00949, 2017 WL 4123050 (S.D. Ind. Sept. 18, 2017). Roche's claims against Olympus, Delta, Alpha XE, and Shaya, and against individual officers of Northwood and Binson's Hospital Supplies, Inc. (Binson's), Northwood's parent company, were dismissed without prejudice by the Indiana Federal District Court for lack of personal jurisdiction. *Roche*, No 1:17-cv-00949, 2017 WL 4123050, at *6–7, 10.

Meanwhile, in late 2017, Northwood filed its own suit against Olympus, Delta, Shaya, and Shaya's business partners Jeremiah Mankopf (Olympus) and Daniel Gladys (Delta) in Michigan state court. *Northwood, Inc. v. Olympus Global, LLC*, 2017-004622, 2019 WL 856573 (16th Mich. Cir. Ct. Jan. 18, 2019). In this suit, Northwood blamed Shaya, his partners, and his companies, in its claims for negligent misrepresentation, fraudulent misrepresentation, fraud in the inducement, innocent misrepresentation, silent fraud, breach of contract, civil conspiracy to defraud, contractual indemnity, common law indemnity, piercing the corporate veil and tortious interference with a contract. *See id.* Shaya and Gladys counterclaimed against Northwood for negligence, fraud/misrepresentation, and silent fraud. *Id.* By Opinion and Order dated September 17, 2019, the Circuit Court for Macomb County granted Northwood's motion for summary disposition of Shaya's and Gladys' counterclaims. (*See* ECF No. 33, Third-Party Defendants' Motion, Exhibit A, PageID.483–92.) It found that Shaya and Gladys failed to show that Northwood

2

owed them a duty to tell them not to sell in retail markets, failed to show that Northwood made any misrepresentation to them, and failed to show that Northwood had a legal duty to Shaya and Gladys to disclose the limitations of Northwood's contract with Roche. (*Id.*) Later, a jury rendered a verdict in favor of Shaya, Olympus, and Delta, finding that Shaya, Olympus, and Delta did not defraud Northwood.

On January 25, 2019, Roche filed this suit against Shaya as well as Kenneth G. Fasse, the President of Northwood and the Executive Vice President and Chief Operating Officer of Binson's, Donnie Dickstein, the Director of Northwood, and James E. Binson I, the Chairman, President and Chief Executive Officer of Binson's, alleging Fraud in the Inducement, Fraud, Aiding and Abetting Fraud, Conspiracy to Commit Fraud, Negligent Misrepresentation (against all Defendants except Shaya), Unjust Enrichment, and Tortious Interference with Contract (against Shaya alone). (Complaint, ECF No. 1.) The Indiana case was settled, and pursuant to that settlement, Roche dismissed its claims against Dickstein, Fasse, and Binson on March 11, 2019. (*See* ECF No. 6, Notice of Partial Dismissal.) The only remaining Defendant in this case is Christopher Shaya.

On December 3, 2019, this Court issued an Opinion and Order Denying Defendant Shaya's Motion for Judgment on the Pleadings as to Plaintiff Roche's

Complaint, and dismissed Third-Party Plaintiff Shaya's Complaint against Northwood, Dickstein, and Fasse, with prejudice. (ECF No. 36.)

This Court held a Zoom virtual hearing on July 22, 2021 regarding Defendant Shaya's February 19, 2021 Motion for Summary Judgment. (ECF No. 76.) For the reasons that follow, the Defendant's motion will be denied in its entirety.

## II.    Background

Roche manufactures blood glucose test strips, which people with diabetes use to monitor their blood sugar. (Complaint, ECF No. 1, PageID.8, ℙ 24.) Roche sells two kinds of strips, not-for-retail sale (NFR) strips and retail strips. (*Id.* at ℙ 25.) The retail strips are sold to distributors who sell the strips to pharmacies, who then sell the strips to people without insurance and to people whose insurance covers the strips as a pharmacy benefit (like a prescription drug). (*Id.* at ℙ 26.) Roche sells NFR strips, in different packaging, to mail-order Durable Medical Equipment (DME) providers, who provide the strips directly to patients whose insurance covers the strips as a durable-medical-equipment benefit (like a wheelchair). (*Id.* at ℙℙ 27–28.)

The list prices for the retail and NFR strips are very different. In 2014 and 2015 Roche sold its retail strips for roughly $65-71 per 50-strip box and its NFR strips for $13 or less per 50-strip box. (Declaration of Kimberly Ober, Roche

4

Marketing Manager ("Ober Decl.") ¶ 11-12, ECF No. 90-2.) One reason why the price for the retail strips was so much higher than the price for the NFR strips is because Roche paid rebates to pharmacy-benefit insurers for sales of the retail strips, but did not pay rebates on the NFR strips. (*Id.*)

Binson's and its subsidiary, Northwood, were distributors of Roche's NFR strips under a contract signed in 2011 ("Agreement"). (Roche-Binson's/Northwood Agreement, ECF No. 90-3.) The Agreement between Binson's, Northwood, and Roche required Binson's and Northwood to limit their sales of Roche's NFR strips to patients with DME insurance or to one of Roche's pre-approved DME providers, which were specifically enumerated in the Agreement. (*Id.* at PageID.2766; Ober Decl. ¶ 13-14.) The Agreement also included a sales tracing mechanism that allowed Roche to verify that the NFR strips it sold to Binson's and Northwood were being distributed to DME beneficiaries. (Roche-Binson's/Northwood Agreement, ECF No. 90-3 PageID.2767-69; Ober Decl. ¶ 15.) Roche would sell Binson's and Northwood the NFR strips at a higher price, then Binson's and Northwood would submit "sales tracings" that included data on each individual sale of the NFR strips and thereby confirmed that all the NFR strips were going to DME beneficiaries. (*Id.*)

From February 10, 2011 until July 21, 2014, Roche, Binson's, and Northwood operated under this contract, with Roche selling approximately 5,000-10,000 boxes of NFR strips to Binson's and Northwood per month and Binson's and Northwood

reselling those strips to DME beneficiaries. (ECF No. 1 PageID 12–13, 18, ¶¶ 36, 42, 60.)

On July 21, 2014, Roche executed an amendment to its contract with Binson's and Northwood. (Amendment to Roche-Binson's/Northwood Agreement, ECF No. 90-17; Ober Decl. ¶ 16.) The amendment removed the requirement that Binson's and Northwood submit sale tracing data. (*Id*.) But, the restrictions on selling the NFR strips to DME beneficiaries and enumerated DME providers remained.

Roche alleges that it agreed to this contract amendment because Fasse and Dickstein, the President and Director of Northwood, respectively, told Roche that Northwood had access to a large customer base of DME beneficiaries to whom Northwood could sell Roche NFR strips if Northwood no longer had to submit sales tracings. (Ober Decl. at ¶ 16.)

Leading up to the amendment to the Agreement, Colleen Miller, Regional Business Manager at Roche, emailed Dickstein on July 2, 2014 requesting "information regarding the commercial contracts Northwood has in place (i.e. what plans they works with)." (ECF No. 90-16, PageID.2952.) On July 7, 2014 Dickstein emailed a list of 13 insurance plans. (*Id*. at PageID.2951.)

6

Prior to sending this list to Roche, Dickstein emailed Defendant Christopher Shaya on May 16, 2014 saying that he was "still trying to figure out how to make this work within the framework of [Northwood's] manufacturing partners contracts," and asking Shaya to provide him with "some language" for the Roche contract "that would enable to sell strips to other without needing the end user tracings?" (ECF No. 90-10 PageID.2822.)

On July 7, 2014, the date Dickstein sent the list to Roche, Dickstein emailed Shaya earlier in the day saying that "Roche indicated that their VP will be asking about the health plans we will be submitting on the tracings reports so can you send me a list of the health plans? I don't necessarily feel this is going to be that much of an issue because of the declining market share for Roche" (ECF No. 90-13 PageID.2829.) In response, Shaya sent Dickstein a list of 29 health plans with the caveat, "I don't know if they are a provider of diabetes for all of them . . . I would not send the entire list without reviewing as you don't want to send a non diabetes plan." (ECF No. 90-14 PageID.2835.) Shaya later testified that he knew the list was "something to give to Roche to help in [Northwood's] negotiations with Roche" which he wanted "to go well because [he] wanted to be able to buy test strips at a low price and mark them up and sell them to MSSI." (Shaya Dep. 111:22-112:10, ECF No. 90-15.) Dickstein edited the list Shaya sent and then sent that edited list to

Roche on the same date. (ECF No. 90-16 PageID.2951.) All 13 plans on the list sent to Roche were present on Shaya's list sent to Dickstein.

In his declaration, Shaya stated that he "simply provided to Dickstein lists of health plans I obtained from HME [Health Medical Equipment, Inc.]." (Declaration of Christopher F. Shaya ("Shaya Decl.") at ¶ 13, ECF No. 76-4.) When asked during his deposition about where he got this list of health plans, Shaya responded that he got the list from "Ivonne," who Shaya described as "a woman that owned a company that we were trying to do a joint venture with her company and Northwood." (Shaya Dep. 58:11-14, ECF No. 90-15.) "Ivonne" is Ivonne Gonzales of Health Medical Equipment, Inc. (*See* Reply, ECF No. 91 PageID.3299.) Shaya stated that he got the list of health plans that Ivonne serviced and believes he forwarded that list to Dickstein in its entirety. (Shaya Dep. 107:20-24.) Shaya also admitted that he had no idea whether Ivonne or HME ever received any test strips. (*Id.*, at. 60:22–25.)

Two weeks later, on July 21, 2014, Roche signed the contract amendment to remove the requirement that Northwood provide sales tracings. (Amendment to Roche-Binson's/Northwood Agreement, ECF No. 90-17.)

Once the modification eliminated the rebate and sales tracings mechanism, Northwood began increasing the volume of NFR strips that it was ordering from Roche and reselling to Olympus. (ECF No. 1, PageID.20–21, ¶¶ 65–68.)

Following Northwood's request for increased credit enabling it to purchase larger volumes (ECF No. 90-20 PageID.2976–77), Noelle Adams at Roche emailed Dickstein on December 8, 2014 requesting "more information to understand where that volume is coming from." (ECF No. 90-18.)

Dickstein emailed Shaya on December 8, 2014 with the list of the health plans already provided to Roche, and that Dickstein "would like to see 10-15 more without including Medicaid" (ECF No. 76-4 PageID.1520.) Later that morning, Shaya emailed Dickstein a list of health plans he obtained from Ivonne at HME. (ECF No. 90-19 PageID.2966–69.) The next day, on December 9, 2014, Dickstein emailed to Roche a list which he labeled as the "updated payer list." (ECF No. 90-20 PageID.2974.) The list sent to Roche contained 29 health plans, nearly all of which were on Shaya's list. Roche approved the credit increase. (Ober Decl. at ¶ 17.)

At some point, Shaya dissolved Olympus and created a different company, Delta, with new business partner Daniel Gladys. (Shaya Dep. 207:16–208:5, ECF No. 90-15.) Delta took over purchasing strips from Northwood. (*Id.*) Shaya also created another company, Alpha XE, LLC, to make the sales of strips to MSSI. (*Id.*)

Roche claims to have lost $84 million in profits and millions more in unwarranted rebates on NFR strips sold in retail markets as a result of this scheme.

(Complaint, ECF No. 1 ¶¶ 127–28.) Roche also alleges that Shaya made $8 million in personal profits. (*Id.* at ¶ 90.)

## III.    Standard of Review

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a

preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## IV. Analysis

### a. Is Roche Diabetes Care, Inc. a Valid Plaintiff?

Defendant Shaya argues that Roche Diabetes Care, Inc. ["RDCI"] is not a valid plaintiff because it was not involved in the transactions at issue, as only Roche

Diagnostics Corp. ["RDC"] sold strips to Northwood. RDC operated the commercial diabetes business until November, 2015, when it transferred this business to RDCI. All claims in this case are based on transactions that took place between July 21, 2014 and September 24, 2015, and RDCI was not involved in these transactions.

The record evidence shows that RDCI is the successor in interest to RDC. On November 2, 2015, RDC and RDCI entered into a Capital Contribution Agreement wherein RDC contributed its domestic diabetes care business to RDCI, including "all claims of RDC against third parties to the extent relating to RDC's operation of the Diabetes Care Business, whether . . . known or unknown." (Capital Contribution Agreement, ECF No 87-7, PageID.2524.) A successor in interest is defined as "someone who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance." *Tr. v. Bartle*, No. 12-14412, 2016 WL 5661573, at *3 (E.D. Mich. Sept. 30, 2016) quoting Bryan A. Garner, *Black's Law Dictionary* 1660 (10th ed. 2014). Plaintiffs also point to interrogatory responses that state that RDCI paid approximately $21 million in rebates on the test strips at issue on or after November 2, 2015. (Interrogatory Responses, ECF No. 90-32, PageID.3119; Ober Decl. at ¶ 21, ECF No. 90-2, PageID.2628.)

Further, as this Court has already held in this case, the allegations in the complaint demonstrated that RDCI is the successor in interest to RDC and possesses

12

"the right to bring the claims at issue in this case." (Opinion and Order Denying Motions for Reconsideration, ECF No. 53 PageID.942; *See also* Opinion and Order Denying Shaya's Motion for Judgment on the Pleadings, ECF No. 36 PageID.554–55.)

Roche Diabetes Care, Inc. is a proper plaintiff in this case, and Defendant's Motion for Summary Judgment on this issue is DENIED.

### b. Fraud Claims

The Defendant moves for summary judgment on the claims for Fraud, Aiding and Abetting Fraud, and Conspiracy to Commit Fraud. To establish actionable fraud, a plaintiff must show that (1) the defendant made a material representation, (2) the representation was false, (3) the defendant knew the representation was false or recklessly made the representation as a positive assertion without knowledge of its truth, (4) the defendant made the representation with the intention that the plaintiff act on it, (5) the plaintiff acted in reliance on the representation, and (6) the plaintiff suffered injury. *1031 Lapeer LLc v. Rice,* 290 Mich. App. 225, 236, 810 N.W.2d 293, 300 (2010).

The fraud claims revolve around two lists of health plans that Shaya sent to Donnie Dickstein, Director of Northwood. The first list was sent in July, 2014, and

the second in December, 2014. Roche alleges that Shaya defrauded Roche by providing the lists of health plans to Dickstein with the knowledge that Dickstein would pass the lists on to Roche, which relied upon the lists, first when it agreed to amend its Agreement with Binson's/Northwood to eliminate the rebate and sales tracing mechanism in July, 2014, and then when it agreed to increase Northwood's line of credit in December, 2014. (ECF No. 1, Complaint, PageID. 38–40, ¶¶ 130–33, 135–37.)

On the question of whether Defendant Shaya made a material representation to Roche, Defendant argues that he made no representations to Roche, as he provided the lists of health plans only to Dickstein at Northwood, and Roche admits that it had no direct communications with Shaya during the relevant period. (ECF No. 76 PageID.1455 citing RFA No. 1, ECF No. 90-32 PageID.3116.)

Contrary to Defendant's argument that he cannot be liable in fraud because he did not communicate directly with Roche, Michigan courts have "repeatedly held that where a party makes false representations to another with the *intent or knowledge* that they be *exhibited or repeated* to a third party for the purpose of deceiving him, the third party, if so deceived to his injury, can maintain an action in tort against the party making the false statements for the damages resulting from the fraud." *Arrowood Indem. Co. v. City of Warren*, No. 13-13938, 2015 WL 58679, at *6 (E.D. Mich. Jan. 5, 2015), *aff'd sub nom. Arrowood Indem. Co. v. Cristini*, 630

14

F. App'x 512 (6th Cir. 2015) citing *Opperhuizen v. Wennersten,* 2 Mich. App. 288, 294, 139 N.W.2d 765, 768 (1966) (emphasis in original); *See also Nernberg v. Pearce*, 35 F.3d 247, 251 (6th Cir. 1994) ("[A] plaintiff may maintain an action for fraud even when a misrepresentation has ... been made to a third party with the intent and expectation that the misrepresentation would be repeated to induce reliance by a principle participant to a business undertaking....").

The evidence shows that Shaya knew, when asked by Dickstein to send a list of health plans, that this list would be sent to Roche, and that the purpose of this list was to assist in negotiations so that Shaya could continue to obtain strips at a low price and sell them to retail channels. (Shaya Dep. 111:22–112:10, ECF No. 90-15):

> Q. And that list you were giving them so that they could have something to give to Roche to help in their negotiations with Roche; correct?
>
> A. Yes.
>
> ***
>
> Q. And you wanted the -- you wanted the negotiations with Roche to go well because you wanted to be able to buy test strips at a low price and mark them up and sell them to MSSI? That was your business; correct?
>
> A. Yes.

Thus, because the evidence shows that Shaya sent the list of health plans to Dickstein with the intent and knowledge that it would be sent to Roche, Shaya made a representation to Roche under Michigan law.

Defendant argues that Shaya made no false representations because Dickstein made some changes to Shaya's lists before sending to Roche. (ECF no. 91 PageID.3298–99.) Defendant cites no cases to support this argument. It cannot be disputed that the vast majority of the substance of both lists of health plans sent to Roche was comprised of the health plans sent by Shaya.

There is also evidence of the falsity of the Defendant's representation and his knowledge of the falsity of the representation. In his declaration, Shaya stated that he "simply provided to Dickstein lists of health plans I obtained from HME" (ECF No. 76-4 PageID.1506, Shaya Decl. at ¶ 13; Shaya Dep. 58:11–14, ECF No. 90-15.) HME, however, is not at all related to the test strips at issue in this case. Shaya admitted that he had no idea whether HME ever received any test strips. (Shaya Dep. at 60:22-25.) Shaya's declaration also implies that this list of health plans from HME is somehow related to discussions between Northwood and Olympus regarding "potential business beyond the strips transactions," which involved HME and a Memorandum of Understanding between Olympus and HME. (Shaya Decl. at ¶¶ 6– 13; Memorandum of Understanding, ECF No. 76-4 PageID.1510–1516.) This contention that the lists are somehow related to other business is directly refuted by evidence in the record.

The evidence shows that Shaya was aware that these lists were being compiled in response to inquiries from Roche regarding to whom the strips were being sold.

On July 7, 2014, Dickstein emailed Shaya, stating that, "Roche indicated that their VP will be asking about the health plans we will be submitting on the tracings reports so can you send me a list of the health plans? I don't necessarily feel this is going to be that much of an issue because of the declining market share for Roche" (ECF No. 90-13 PageID.2829.) On that same date, along with the list of heal plans, Shaya expressed his concern about sending this list to Roche: "I don't know if they are providers of diabetes for all of them. You may know by looking. I would not send the entire list without reviewing as you don't want to send a non diabetes plan." (ECF No. 90-14.)

Defendant Shaya argues that "there is no evidence the lists provided by Shaya to Dickstein were 'misleading' or 'false.' … Plaintiffs have presented to this Court no evidence these insurers did not exist … ." (Defendant's Reply ECF No. 91 PageID.3300.) Defendant's argument is that because the list of plans was a list of insurers that existed in the world, then the list was not misleading or false. While the lists indeed may be lists of health plans that exist, Shaya obtained the lists from a business associate who was in no way related to the test strips at issue in this case, and then sent the lists to Dickstein with the knowledge that they would be used in negotiations regarding test strips.

Finally, the evidence shows that the Plaintiff acted in reasonable reliance on that representation. After the list was sent to Roche on July 7, 2014, Roche and

Binson's executed an amendment to their contract to loosen the tracing requirements. (Amendment to Roche-Binson's/Northwood Agreement, ECF No. 90-17; Ober Decl. at ¶ 16.) Then in December, 2014 after Shaya sent the second list, to raise Northwood's credit limit to allow Northwood to purchase a larger volume of test strips. (Ober Decl. at ¶ 17.)

On this point, Defendant argues that Roche did not reasonably rely on the representations because "Roche made no effort to determine the accuracy of these representations." (Motion for Summary Judgment, ECF No. 76 PageID.1459.) "A misrepresentation claim requires reasonable reliance on a false representation." *Nieves v. Bell Indus., Inc.,* 204 Mich. App. 459, 464, 517 N.W.2d 235, 238 (1994). "There can be no fraud where a person has the means to determine that a representation is not true. *Id.* (citations omitted). However, fraud does "not require the party asserting fraud to have performed an investigation of all assertions and representations made by its contracting partner as a prerequisite to establishing fraud." *Titan Ins Co v Hyten*, 491 Mich. 547, 557, 817 N.W.2d 562 (2012). The *Titan Ins Co* Court further clarified that while it is true that a "fraud is not perpetrated upon one who has full knowledge to the contrary of a representation … there is no common-law duty to attempt to acquire such knowledge." *Id.* at n.4.

Defendant's argument that Roche had a duty to "determine the accuracy of these representations" goes beyond the requirements of Michigan law. For example,

the *Nieves* Court determined that while the plaintiff read at-will language in employment documents, he chose to believe other representations rather than the signed contract. *Nieves,* 204 Mich App at 465. Here, Defendants have not alleged that Roche had information that it chose to ignore or otherwise knew of a position contrary to the relevant representations. Rather, Defendants argue that Roche did not perform sufficient due diligence because had it done so, it could have easily discovered Defendants' misrepresentations. Defendants have not cited authority requiring such efforts, and the Court notes that this same argument by the Defendant was rejected by the Michigan Court of Appeals when it was made against Northwood. *See also Northwood, Inc. v. Olympus Global, LLC*, No. 2017-004622, 2019 WL 856573, at *3 (Mich. Cir. Ct. Jan. 18, 2019) (rejecting Shaya's argument that Northwood made no effort to determine the accuracy of Shaya's representations on similar grounds.)

Outstanding questions of material fact remain on each element of Fraud. Accordingly, Defendant's Motion for Summary Judgment on the Fraud claim is DENIED.

### i.  Aiding and Abetting Fraud

In ruling on the Motion for Judgment on the Pleadings (Opinion and Order, ECF No. 36 PageID.559–563), this Court previously cited *El Camino Resources Ltd.*

*v. Huntington Nat'l Bank*, where the United States Court of Appeals for the Sixth Circuit held that given the opportunity, the Michigan Supreme Court "would adopt the approach of aiding and abetting as set forth in § 876(b) of the Restatement (second) of Torts." 712 F.3d 917, 922 (6th Cir. 2013). Under this approach, an aiding and abetting claim requires proof of "(1) knowledge of wrongful conduct by the aider/abettor; and (2) substantial assistance of the wrongful conduct by the aider/abettor." *Id*.

Defendant Shaya argues that in a subsequent unpublished opinion, *Genesee Intermediate Sch. Dist. v. City of Flint Sch. Dist*., No. 345395, 2020 WL 4915430, at *12 (Mich. Ct. App. Aug. 20, 2020), the Michigan Court of Appeals "expressly refused to recognize a claim for aiding and abetting fraud." (Motion for Summary Judgment, ECF No. 76 PageID.1460).

Contrary to Defendant's argument, the Michigan Court of Appeals in *Genesee* recognized that the Michigan Supreme Court has not expressly recognized aiding and abetting fraud, and declined to consider "expanding the common law to create such a cause of action," because the parties had not adequately briefed the issue. *Id*. at *12. The claim for aiding and abetting fraud in that case was also precluded by MCL § 600.2962, which limits the circumstances in which a certified public accountant may be held liable for civil damages in connection with public accounting services. *Id*. at *13.

20

This Court's prior determination on this issue should not be disturbed unless there is "a subsequent contrary view of law by the controlling authority," *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). The Michigan Supreme Court has not ruled on this issue, and the Michigan Court of Appeals' unpublished opinion in *Genesee* does not disturb the holding in *El Camino*, or this Court's prior determination that the Plaintiffs had plead a claim for Aiding and Abetting Fraud.

Turning to the evidence of Aiding and Abetting Fraud, Defendant Shaya argues that he did not have actual knowledge of Northwood's wrongful conduct. In *El Camino,* the Sixth Circuit determined that a "strong suspicion of wrongdoing, but no actual knowledge" of fraud was insufficient to satisfy the knowledge requirement of an aiding and abetting fraud claim. *El Camino*, 712 F.3d at 922. Defendant argues that "[u]nrebutted evidence indicates Dickstein led Shaya to believe Northwood had amended its contract with Roche to allow Northwood to sell Strips to Olympus, and Shaya was never provided a copy of the July 2014 amended agreement between Roche and Northwood." (Motion for Summary Judgment, ECF No. 76 PageID.1461 citing Shaya Decl. at ¶ 5). In his declaration, Shaya cites a June 30, 2014 email from Dickstein in which Dickstein stated that, "we should be good to go on our end" and a text from July 10, 2014 in which Dickstein stated, "[w]e got approval and are good to move forward." (Shaya Decl. at ¶ 5, ECF No. 76-4).

This limited evidence of Shaya's belief, viewed alongside other communications between Dickstein and Shaya, leaves outstanding questions of material fact remain regarding Shaya's actual knowledge of Northwood's alleged fraudulent violation of the Roche-Binson's/Northwood contract.

For example, the email Shaya sent with the list of the health plans on July 7, 2014 shows he was aware that sending a non-diabetes plan would raise concerns at Roche. Along with sending the list of plans, Shaya wrote that, "I don't know if they are providers of diabetes for all of them. You may know by looking. I would not send the entire list without reviewing as you don't want to send a non diabetes plan." (ECF No. 90-14).

Plaintiffs also identify text messages between Shaya and Dickstein that demonstrate that Shaya was cautious about placing large orders with Roche to avoid suspicion:

> Shaya: "but ur not worries?"
>
> Dickstein: "They first asked in June and we fought it off so I feel we will be ok"
>
> Shaya: "Ur not worried about keep pushing these large orders?
>
> Dickstein: "No. The orders should continue and grow to show consistency."

(ECF No. 90-21.)

22

> Shaya: "Hold off on Monday order I think we should consider … I think that is too many … We should split the order in half … Cause that's a huge spike"

(ECF No. 90-24 June 12, 2015 Text message to Dickstein.)

Regarding another text message conversation with Dickstein on March 8, 2015, in which Shaya suggested splitting an order, Shaya testified:

> A. I'm suggesting, yeah. I don't know if in half, but suggesting it be split, yes.
>
> Q. So that it doesn't look suspicious?
>
> A. Partially, yes.
>
> Q. So that it seems consistent with the other orders that are being made?
>
> A. Yes.

(Shaya Dep. 208:6–20, ECF No. 90-15.)

As for substantial assistance of Northwood's alleged fraud, it is clear outstanding questions of material fact remain. Shaya obtained the lists of health plans in response to requests from Dickstein, the Director of Northwood. Shaya also acted as the buyer of test strips from Northwood and seller of test strips to non-DME channels. This evidence is more than sufficient to establish outstanding questions of material fact regarding Shaya's substantial assistance of Northwood's wrongful conduct.

Accordingly, Defendant Shaya's Motion for Summary Judgment on the claim for Aiding and Abetting Fraud is DENIED.

### ii.  Conspiracy to Commit Fraud

Defendant's sole argument in favor of summary judgment on the Conspiracy claim is the absence of an underlying claim for Fraud. Because Defendant is not entitled to summary judgment on the underlying claim for Fraud, summary judgment in favor of the Defendant on the Conspiracy claim is DENIED.

### c.  Unjust Enrichment

In order to sustain the claim of unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478, 666 N.W.2d 271, 280 (2003). The doctrine of unjust enrichment effectively creates an implied contract or a *quasi* contract between the plaintiff who conferred the benefit and the defendant who was inequitably enriched. *Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 443 Mich. 176, 185–86, 504 N.W.2d 635, 640 (1993). The Michigan Supreme Court has noted that, "(e)ven though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, '[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other.' *Michigan Educ.*

24

*Emps. Mut. Ins. Co. v. Morris*, 460 Mich. 180, 198, 596 N.W.2d 142, 151 (1999) citing Restatement Restitution, § 1, p. 12.

Defendant argues, essentially, that Plaintiffs have failed to state a claim for unjust enrichment under Michigan law because Plaintiffs here must establish "either (i) interaction with Shaya, or that (ii) Plaintiffs conferred a benefit directly on Shaya." (Reply, ECF No. 91 PageID.3302.) According to the Defendant, "there is no case decided under Michigan law which recognizes an unjust enrichment claim where there was no interaction between the plaintiff and defendant." (ECF No. 76 PageID.1464.)

This argument was addressed, and rejected, in this Court's Opinion and Order Denying Defendant Shaya's Motion for Judgement on the Pleadings (ECF No. 36 PageID.565–69.) Defendant renewed this argument in his Motion for Reconsideration. (ECF No. 38.) Defendant's now-third swing at the plate with this same argument cites largely the same cases and does not identify any changes in the applicable law since that decision was made.

Under the law of the case doctrine, "a court should not reopen issues decided in earlier stages of the same litigation." *Agostini v. Felton,* 521 U.S. 203, 236 (1997). The doctrine does not apply, however, if the court is "convinced that [its prior decision] is clearly erroneous and would work a manifest injustice." *Arizona v. California,* 460 U.S. 605, 618, n. 8 (1983). The Sixth Circuit expanded this to three

exceptions: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *Hanover Insurance Co. v. American Engineering Co.,* 105 F.3d 306, 312 (6th Cir.1997); *Balsley v. Thermo Power Corp.*, 151 F. Supp. 2d 872, 876 (E.D. Mich. 2001). None of these exceptions are present in the case at hand.

Turning to the evidence of unjust enrichment, Defendant Shaya has failed to demonstrate that there are no questions of material fact regarding whether defendant Shaya received a benefit from the Plaintiff, and that there was inequity resulting to the Plaintiff because of the retention of the benefit by the Defendant. Accordingly, Defendant Shaya's Motion for Summary Judgment on the Unjust Enrichment claim is DENIED.

### d.  Tortious Interference

The elements of tortious interference with a contractual relationship are: (1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant. *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 95, 443 N.W.2d 451, 462 (1989).

Defendant Shaya argues that he believed Roche had agreed to amend the contract in July 2014 to permit test strips to be sold to his company Olympus. The Defendant does not produce unrebutted evidence to support this belief, and more importantly, does not produce any evidence to justify his belief that the now-amended contract allowed Northwood to purchase low-priced NFR test strips, sell those strips to Olympus, who would then sell to retail channels. In his declaration, Shaya cites a June 30, 2014 email from Dickstein in which Dickstein stated that, "we should be good to go on our end" and a text from July 10 that stated, "[w]e got approval and are good to move forward." (Shaya Decl. at ¶ 5 ECF No. 76-4.) This evidence, viewed in light of all the record evidence, leaves outstanding questions of material fact regarding Shaya's knowledge that the alleged diversion of test strips to the retail market would violate the Roche-Northwood contract.

The evidence shows that Shaya was told that the contract was being amended to remove the requirement that Northwood supply sales tracings to Roche. On July 7, 2014, Dickstein emailed Shaya saying that "Roche indicated that their VP will be asking about the health plans we will be submitting on the tracings reports so can you send me a list of the health plans? I don't necessarily feel this is going to be that much of an issue because of the declining market share for Roche" (ECF No. 90-13 PageID.2829.) In response, on July 7, 2014, Shaya sent Dickstein a list of 29 health plans with the caveat, "I don't know if they are a provider of diabetes for all of

them . . . I would not send the entire list without reviewing as you don't want to send a non diabetes plan." (ECF No. 90-14 PageID.2835.) Shaya later testified that he knew the list was "something to give to Roche to help in [Northwood's] negotiations with Roche" which he wanted "to go well because [he] wanted to be able to buy test strips at a low price and mark them up and sell them to MSSI." (Shaya Dep. 111:22–112:10, ECF No. 90-15.)

Even if Shaya believed the July 2014 amendment to the contract that occurred following his sending the list of health insurers to be sent to Roche allowed the sales arrangement to non-DME channels, this is directly rebutted by the fact that Shaya sent a *second* list of health insurers obtained from HME (again, not related to these transactions) to which Northwood/Olympus was supposedly selling in December 2014 for use in negotiations with Roche.

Text messages from Shaya, excerpted above, showing his concern with placing large orders with Roche also lead to the inference that he was aware that the current sales arrangement was in violation of the Roche-Northwood contract. (*See*, ECF No. 90-21; ECF No. 90-24.)

This evidence plainly establishes that triable issues of fact remain regarding Shaya's knowledge that he was acting with Northwood to breach the Roche-

Binson's/Northwood contract.  Defendant Shaya's Motion for Summary Judgment on the Tortious Interference with Contract claim is DENIED.


### e.  Proximate Cause

Proximate cause is "'that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred . . . .'" *McMillian v Vliet*, 422 Mich. 570, 576; 374 N.W.2d 679 (1985) (citation omitted). "Generally, proximate cause is a factual issue to be decided by the trier of fact. However, if reasonable minds could not differ regarding the proximate cause of the plaintiff's injury, the court should decide the issue as a matter of law." *Nichols v Dobler*, 253 Mich. App. 530, 532; 655 N.W.2d 787 (2002).

Defendant Shaya argues that "reasonable minds cannot disagree that the proximate cause of the unwarranted rebates is the fraudulent rebate submissions, none of which were submitted by Shaya or the customers of Olympus/Delta." (ECF No. 76 PageID.1468.) Contrary to Defendant's argument, record evidence shows that reasonable jurors could determine that the damages incurred by Plaintiffs were a direct and foreseeable result of Defendant Shaya's actions.

Defendant's Motion for Summary Judgment on the issue of proximate cause is DENIED.


## V.     Conclusion

Defendant Christopher F. Shaya's Motion for Summary Judgment (ECF No. 76) is DENIED in its entirety.

**SO ORDERED.**



Dated: July 28, 2021                              s/Paul D. Borman
                                                  Paul D. Borman
                                                  United States District Judge