UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROCHE DIAGNOSTICS CORP. and
ROCHE DIABETES CARE, INC.,

          Plaintiffs,               Case No. 19-10264

v                              Honorable Paul D. Borman

DONNIE E. DICKSTEIN, KENNETH
G. FASSE, JAMES E. BINSON I, and
CHRISTOPHER F. SHAYA,

          Defendants,

_____/

| | |
|---|---|
| RAYMOND W. HENNEY (P35860) | EDWARD G. LENNON (P42278) |
| Honigman LLP | Lennon Law PLLC |
| Attorney for Plaintiffs | Attorney for Christopher Shaya |
| 660 Woodward Ave., Ste. 2290 | 355 S. Old Woodward, Ste. 100 |
| Detroit, MI 48226 | Birmingham, MI 48009 |
| (313) 465-7410 | (248) 723-1276 |
| rhenney@honigman.com | |

GEOFFREY POTTER, ESQ.
ARON FISCHER, ESQ.
Patterson Belknap, Webb & Tyler LLP
Co-counsel for Plaintiffs
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
gpotter@pbwt.com
afischer@pbwt.com

_____/

**DEFENDANT CHRISTOPHER SHAYA'S MOTION FOR
RECONSIDERATION OF NOVEMBER 9, 2023 OPINION AND
ORDER GRANTING PLAINTIFFS' MOTION IN LIMINE TO**

## PRECLUDE EVIDENCE OR ARGUMENT REGARDING
## MANUFACTURING COSTS OR PROFIT MARGINS

Defendant, Christopher Shaya, by and through his attorneys, Lennon Law PLLC, pursuant to E.D. Mich. LR 7.1(h), hereby moves for reconsideration of a portion of this Court's November 8, 2023 Opinion and Order Granting Plaintiffs' Motion in Limine to Preclude Evidence or Argument Regarding Manufacturing Costs or Profit Margins.

On November 22, 2023, undersigned counsel for Shaya sent an email to counsel for Plaintiffs requesting concurrence in the relief requested in this motion. Plaintiffs' counsel did not concur.

Wherefore, Defendant Christopher Shaya requests that this Court grant his motion for reconsideration, and that this Court deny Plaintiffs' motion in limine to preclude evidence or argument regarding manufacturing costs or profit margins.

Respectfully submitted,

LENNON LAW PLLC

*/s/Edward G. Lennon*
Edward G. Lennon (P42278)
Attorney for Christopher Shaya
355 S. Old Woodward, Ste. 100
Birmingham, MI 48009
(248) 723-1276
elennon@lennonlawpllc.com

Dated: November 24, 2023

ii

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


ROCHE DIAGNOSTICS CORP. and
ROCHE DIABETES CARE, INC.,

                     Plaintiffs,               Case No. 19-10264

v                                       Honorable Paul D. Borman

DONNIE E. DICKSTEIN, KENNETH
G. FASSE, JAMES E. BINSON I, and
CHRISTOPHER F. SHAYA,

| |
|---|
| **CHRISTOPHER SHAYA'S BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION** |

                     Defendants,

and

_____/

| | |
|---|---|
| RAYMOND W. HENNEY (P35860) | EDWARD G. LENNON (P42278) |
| Honigman LLP | Lennon Law PLLC |
| Attorney for Plaintiffs | Attorney for Christopher Shaya |
| 660 Woodward Ave., Ste. 2290 | 355 S. Old Woodward, Ste. 100 |
| Detroit, MI 48226 | Birmingham, MI 48009 |
| (313) 465-7410 | (248) 723-1276 |
| rhenney@honigman.com | |

GEOFFREY POTTER, ESQ.
ARON FISCHER, ESQ.
Patterson Belknap, Webb & Tyler
LLP
Co-counsel for Plaintiffs
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
gpotter@pbwt.com
afischer@pbwt.com

_____/

**<u>DEFENDANT CHRISTOPHER SHAYA'S BRIEF IN SUPPORT OF</u>**
**<u>MOTION FOR RECONSIDERATION OF NOVEMBER 9, 2023</u>**
**<u>OPINION AND ORDER GRANTING PLAINTIFFS' MOTION IN</u>**
**<u>LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT</u>**
**<u>REGARDING MANUFACTURING COSTS OR PROFIT MARGINS</u>**

Respectfully submitted,

LENNON LAW PLLC

*/s/Edward G. Lennon*
Edward G. Lennon (P42278)
Attorney for Christopher Shaya
355 S. Old Woodward, Ste. 100
Birmingham, MI 48009
(248) 723-1276
elennon@lennonlawpllc.com

Dated: November 24, 2023

# **TABLE OF CONTENTS**

Statement of Issues Presented……………………………………………..vii

Controlling Authority……………………………………...……………viii

Introduction………………………………………………………….……1

Statement of Relevant Facts………………………………………….…...3

I.   Stipulated Facts..……………..…...…………………………...…….3

II.  Northwood and Plaintiffs both made substantial profits from the strips
     transactions………………………………………………………6

III. Plaintiffs' damage claim is based on solely unsupported assumptions
     of its expert………………………………………………………6

     A.  Without any factual support, Plaintiffs and their expert assume
         that, but for Shaya's actions, all of the sales at issue would have
         been replaced by an equal amount of sales in the retail
         channel……………………………………………………7

     B.  Without any factual support, Plaintiffs and their expert assume
         that Plaintiffs paid rebates on all 1.5 million boxes, lowering
         Plaintiffs' profit margin………………………………………..8

ARGUMENT……………………………………………………………10

I.   The standard for a motion for reconsideration………………………10

II.  This Court's November 9, 2023 Opinion and Order is clearly
     erroneous because it fails to consider the possibility that the jury will
     reject the unsupported assumptions of Plaintiffs' damage expert, and it
     ignores other possible scenarios indicating that Plaintiffs suffered no
     damages.  This Court's decision prevents Shaya from receiving a fair
     trial because Shaya will not be allowed to show Plaintiffs made a
     profit – and thus suffered no damages - if its expert's unsupported
     assumptions are rejected. …………………………………...…11

CONCLUSION……………………………………………………………18

## <u>STATEMENT OF ISSUES PRESENTED</u>

1. Defendant intends to rebut Plaintiffs' damage presentation by proving and arguing Plaintiffs made a net profit on the transactions at issue. Is Plaintiffs' own evidence of its per box manufacturing cost relevant to Defendant's argument that Plaintiff suffered no damages and actually made a net profit?

2. Would evidence of Plaintiffs' per box manufacturing cost, a single number, be confusing to the jury?

3. Should this Court prevent Defendant from presenting a damage defense that establishes Plaintiffs made a profit on the transactions at issue if one rejects the unsupported assumptions made by Plaintiffs' damage expert?

4. Did this Court commit error in granting Plaintiffs' motion in limine, the result of which is that Defendant is precluded from rebutting Plaintiffs' damage theory?

## CONTROLLING AUTHORITY

## CASE LAW

*Bell v Prefix, Inc.*, 2009 U.S. Dist. LEXIS 101889*3 (E.D. Mich.2009)……………………………………………………………12

*Bunch v Pacific Cycle, Inc*., 2015 WL 11622952, at *10 (N.D. Ga. April 27, 2015) ....................................................…..…..17

*GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) ............................................................ …………..11

*Mannino v International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981)....17

*McDowell v. Dynamics Corp. of America,* 931 F.2d 380 (6th Cir.1991) … ...............................................................................11

*Shivers v. Grubbs*, 747 F.Supp. 434 (S.D. Ohio 1990) ......................…....11

*SPX Corp. v. Bartec USA, LLC*, 574 F. Supp. 2d 748, 2008 WL 3850770, at *3 (E.D. Mich. 2008)...........................................................…12

*United States v. Lockett*, 328 F. Supp. 2d 682, 684 (E.D. Mich. 2004) .. ............................................................... …………………...10

## RULES OF CIVIL PROCEDURE

E.D. Mich. LR 7.1(h)(3)……………………………………...…….10

Fed. R. Civ. P. 59(e)……………………………………...……11

## RULES OF EVIDENCE

F.R.E. 401………………………………………………...…11

# **INTRODUCTION**[1]

Based on Plaintiffs' assertion as to its manufacturing costs, Plaintiffs' Rule 30(b)(6) representative testified Plaintiffs[2] made in excess of $11 million in net profit selling the 1.5 million boxes of diabetic test strips (the "Strips") to Northwood, Inc. ("Northwood"), the sole transactions at issue in this case. Northwood sold those Strips to two companies affiliated with Christopher Shaya ("Shaya"), Olympus Global LLC ("Olympus") and Delta Global LLC ("Delta").[3]

Plaintiffs claim damages of $84 million in this case based on the wholly unsupported assumption it paid rebates on each of the 1.5 million boxes of Strips, turning its $11.5 million profit into a loss. (ECF No. 1, Page ID 37, 41, 44, 45 and 46; ¶¶126, 142, 155, 163 and 174). Plaintiffs' lost profits claim is based on two critical, unsupported assumptions: (a) instead of selling 1.5 million boxes to Northwood intended for the non-retail channel, it would have sold an identical number in the retail channel at a

---

[1] Shaya utilizes the same nomenclature used in its response to Plaintiffs' motion in limine.

[2] Like Plaintiffs did in their complaint, Shaya uses "Roche" or Plaintiffs to refer to Plaintiffs collectively. Plaintiff Plaintiff Roche Diagnostic Corp. operated the U.S. commercial diabetes business until November, 2015, when the business was transferred to a separate legal entity, Plaintiff Roche Diabetes Care, Inc. (ECF No. 1, PageID6, ¶15). All of the diabetic test strips at issue were sold by Roche Diagnostic Corp.

[3] As Plaintiffs have admitted in this case, Northwood's agreement with Olympus did not require Olympus to sell the Strips in the non-retail channel (ECF No. 1, PageID 14, ¶ 43). There was no written agreement between Northwood and Delta. In other words, neither Shaya nor any of his companies breached any contract.

1

higher price; and (b) although it has no evidence as to the amount of rebates it paid on the 1.5 million boxes, and although it does not know where 1 million of those boxes were distributed, it must have paid rebates of $84 million on those boxes. There is no factual support for these critical assumptions underlying Plaintiffs' damage theory.[4]

If the trial in this matter proceeds to the damages phase, Shaya intends to prove through the testimony of Plaintiffs' witnesses that, if the unsupported assumptions of Plaintiffs' expert are rejected, Plaintiffs actually made a profit on the transactions at issue.   However, this Court's November 9, 2023 Opinion and Order accepts without question Plaintiffs' damage calculations (necessarily accepting the unsupported assumptions of Plaintiffs' expert), and this Court's ruling has now deprived Shaya of an opportunity to show Plaintiffs suffered no damages because the evidence establishes Plaintiffs made a profit, a legitimate defense strategy.   Evidence of Plaintiffs' manufacturing costs obtained directly from Plaintiffs' Rule 30(B)(6) representative is necessary to calculate Plaintiffs' net profits, is highly relevant to Shaya's defense of Plaintiffs' damage theory, would not confuse the jury, and should be admitted into evidence.

---

[4] Roche has no evidence as to who purchased 1 million of the 1.5 million boxes it sold to Northwood, it is unable to identify a single retail purchaser of any of the 1.5 million boxes, and it has done no analysis whatsoever to support its assumptions underlying its damage theory.

## STATEMENT OF RELEVANT FACTS

### I.   Stipulated Facts.

In the Third Revised Joint Proposed Final Pretrial Order (ECF No. 183-1), the parties stipulated to the following facts:

1.    Binson's Hospital Supplies, Inc. ("Binson's") is— and was at all relevant times—a Michigan-based mail-order provider of medical equipment, including blood glucose test strips, and owner of several brick-and-mortar stores in Michigan and Florida where it is possible to purchase medical equipment in person.  Northwood, Inc. ("Northwood") is—and was at all relevant times—a Michigan-based subsidiary of Binson's and a mail-order provider of medical equipment, including blood glucose test strips.

2.    On February 10, 2011, Roche Diagnostics Corporation entered into a product and pricing agreement with Binson's (the "Binson's agreement"), which contracted on behalf of itself and its subsidiary, Northwood. The Binson's agreement permitted Binson's and Northwood to sell NFR test strips purchased from Roche only to (i) patients covered by DME insurance or (ii) to DME providers approved by Roche.

3.    In November, 2015, Roche Diagnostics Corp. transferred its diabetes care business to Roche Diabetes Care, Inc.[5]

4.    The Binson's agreement was amended on several occasions, but the provision requiring that test strips be sold only to DME patients or approved DME providers remained in place at all times.

5.    From 2011 to July 2014, Binson's and Northwood purchased approximately 5,000-10,000 boxes per month of test strips from Roche.  During this time, Binson's and Northwood

---

[5] Collectively, Plaintiffs may be referred to as "Roche".

submitted reports to Roche showing that their sales were to DME beneficiaries.

6.     On May 2, 2014, Northwood entered into a Distributor Agreement with Olympus Global, LLC ("Olympus"). The Distributor Agreement did not require Olympus to sell the NFR test strips to DME patients or providers.

7.     Olympus was jointly owned by Mr. Shaya and Jeremiah Mankopf. Delta Global, LLC ("Delta") was wholly-owned by Mr. Shaya.

8.     At the request of Northwood, Mr. Shaya sent lists of health insurance plans to Binson's and Northwood.

9.     Northwood representatives sent lists of health insurance plans to Roche.[6]

10.     Binson's and Northwood represented to Roche that they had located a trove of new DME patients and that the NFR test strips purchased under the Binson's agreement would be sold to these patients.

11.     Based on representations that the test strips would be sold to DME patients, Roche amended the Binson's agreement on July 21, 2014 to allow Binson's/Northwood to operate without submitting sales tracings that would confirm that the Roche test strips Binson's/Northwood purchased were being dispensed to DME patients.

12.     From July 2014 to September 2015, Northwood sold all of the NFR test strips it purchased from Roche under the Binson's agreement to Olympus and Delta. Neither Olympus nor Delta was an approved DME provider under the Binson's agreement.

---

[6] Binson's/Northwood revised and modified the lists received from Mr. Shaya before sending lists to Roche. Roche refused to stipulate to that undeniable fact because such a stipulation is fatal to any fraud claims.

13.    Under its agreement with Roche, as amended, Binson's and Northwood were not allowed to sell NFR test strips to Olympus or Delta.

14.    The NFR test strips that were sold by Northwood to Olympus and Delta were re-sold to Medical Supply Solutions, Inc. ("MSSI") and Republic Pharmaceuticals ("Republic).

15.    Between July 21, 2014 and September 24, 2015 (when Roche ceased selling test strips to Binson's and Northwood), Northwood sold approximately 1,526,688 50-strip boxes of NFR test strips to Olympus and Delta, which re-sold those test strips to MSSI and Republic.

16.    Roche had no direct communications with Mr. Shaya regarding test strips sold to Binson's and Northwood, and Roche did not pay any money directly to Mr. Shaya, Olympus or Delta.

17.    Roche never sold any test strips directly to Christopher Shaya, Olympus or Delta.

18.    Roche brought claims against Binson's, Northwood, Christopher Shaya and Northwood/Binson's representatives, in Indiana federal court in 2017 (*Roche Diagnostics Corp., et al. v. Binson's Hospital Supplies, Inc., et al.*, Civil Action No. 1:17-cv-0949-TWP-DML (S.D. Ind.)). That case settled in March 2019, with the defendants other than Christopher Shaya agreeing to pay Roche $13 million over a four-year period. Roche subsequently filed this lawsuit against Mr. Shaya and the individual Binson's and Northwood executives, but voluntarily dismissed claims against all individual defendants other than Mr. Shaya, after the Binson's and Northwood executives agreed to participate in the Indiana settlement and pay Roche $13 million.

(ECF No. 183-1, PageID. 4844-4847).  Based on the above, Roche asserts against Mr. Shaya various fraud claims (first and second claims[7]), unjust enrichment (fourth claim) and tortious interference with contract (fifth claim).

## II.     Northwood and Plaintiffs both made substantial profits from the strips transactions.

Undisputed evidence indicates Plaintiffs actually made substantial profits from the approximately 1.5 million boxes of Strips it sold to Northwood.   Plaintiffs' Rule 30(b)(6) representative testified Plaintiffs realized a gross margin of at least $7.67 on each of the 1.5 million boxes it sold to Northwood, resulting in a total profit of at least $11.5 million.  (ECF No. 77 (sealed), pp 35-37[8]).  Northwood realized a gross margin of over $3.2 million on the purchase and re-sale of these strips.  (ECF 78-2, PageID 1651-1654).

## III.    Plaintiffs' damage claim is based on solely unsupported assumptions of its expert.

According to Plaintiffs' complaint, had Plaintiffs known the strips were not being sold in the DME channel, it would not have sold them to Northwood.  (ECF No. 1, PageID 36, ¶ 124).  Plaintiffs' damage model is

---

[7] Roche also asserts aiding and abetting and civil conspiracy claims against Mr. Shaya in the first and second claims.

[8] Plaintiffs charged Northwood $10.67 per box, for total revenue of $16 million. Variable manufacturing costs were no more than $3 per box.  (ECF No. 77 (sealed), pp 34-35).

based on two wholly unsupported assumptions:  (a) instead of selling 1.5 million boxes to Northwood intended for the non-retail channel, it could have sold an identical number in the retail channel at a higher price; and (b) although it has no evidence as to the amount of rebates it paid on the 1.5 million boxes at issue, and although it does not know where 1 million of those boxes were distributed, it must have paid rebates of $84 million on those boxes, turning its $11.5 million net profit into a loss.

A.   <u>Without any factual support, Plaintiffs and their expert assume that, but for Shaya's actions, all of the sales at issue would have been replaced by an equal amount of sales in the retail channel.</u>

Plaintiffs' first unsupported assumption is summarized in their complaint:

> The retail beneficiaries who ultimately purchased the diverted NFR test strips would have instead purchased retail strips. Each sale of diverted NFR test strips therefore replaced a sale of retail strips that would have been made but for Defendants' fraud.

(ECF No. 1, PageID 37, ¶ 125).  Taking direction from Plaintiffs, Plaintiffs' damage expert, Gregory Bell ("Bell"), authored a report that also <u>assumed</u> all of the sales of strips to Northwood would have been replaced by sales of retail strips that would have been sold at pharmacies at a higher price.  (ECF No. 78-3, Page ID 1695, 1697, ¶¶ 28, 31).  Bell's deposition testimony reflects his reliance on this assumption as the basis of his opinions.  (ECF

No. 78-4, Page ID 1788, 1793 and 1798; pp 40, 45, 50).   <u>There is simply no</u> <u>evidence supporting this assumption</u>. Plaintiffs do not know the identity of any of the pharmacies that allegedly sold 1 million boxes of the allegedly diverted strips, and Plaintiffs do not know the identity of a single consumer who purchased those strips.  (ECF No. 77 (sealed), pp 28-29, 56, 60).  There are several other possible scenarios never considered by Bell that would destroy Bell's box-for-box displacement theory, including (i) the strips remain in inventory and were never sold, and (ii) a pharmacy that was unable to purchase the Roche strips would have purchased and sold strips produced by another manufacturer, meaning a diverted Roche strip did not replace what would have been the sale of a Roche retail strip.  Bell wholly ignores any alternative scenarios.

       B.     <u>Without any factual support, Plaintiffs and their expert assume</u> <u>that Plaintiffs paid rebates on all 1.5 million boxes, lowering</u> <u>Plaintiffs' profit margin.</u>

The second assumption underlying the damage model presented by Plaintiffs and Bell is equally unsupported.  <u>Citing no evidence</u>, Bell assumed in his report that Plaintiffs paid a rebate on each of the 1.5 million boxes of strips that was sold (ECF No. 78-3, PageID 1698, 1700, ¶¶ 34(d), 35(e); see also Bell testimony at ECF No. 78-4, Page ID 1821-1824, pp 73-76).  Bell admitted at his deposition he has no knowledge as to the amount Plaintiffs

paid in rebates on the 1.5 million boxes of Strips (ECF No. 78-4, PageID 1819-1820, pp 71-72).  In presenting Bell's damage model to the jury, Plaintiffs will be asking the jury to speculate that the amount of rebates paid on the allegedly diverted strips was the same as what Plaintiffs would have paid on the theoretical sales of its retail strips.

Bell ignored the rebates in his damage calculation, failing to consider any possibility that rebates paid by Roche on diverted strips would be less the rebates paid on the theoretical 1.5 million boxes of displaced retail strips. Because Roche contends the strips were diverted, Roche acknowledges that any rebates paid on those strips were as a result of fraudulent rebate submissions.  (ECF No. 77 (sealed), pp 22-24).  It is not hard to fathom multiple reasons why there would be less fraudulent rebate requests for the allegedly diverted strips than there would be for the theoretical displaced 1.5 million boxes of retail strips, all of which would be legitimately eligible for rebates.  Bell assumes there exists no disincentive to submit fraudulent rebate requests, and Bell's model also fails to account for the possibility that any of the 1 million untraced boxes of strips remain in inventory and were never the subject of a fraudulent rebate request.

Under Bell's far-fetched scenario, there were 1.5 million fraudulent rebate requests, which would be equally matched by 1.5 million legitimate

9

rebate requests but for the diversion. However, if the fraudulent rebates were less than what the rebates would be on the theoretically displaced sales of retail strips, Bell's damage model would have to subtract that difference from the $84 million to arrive at an accurate damage calculation. However, because Roche does not even know where 1 million of the allegedly diverted boxes of strips were ultimately sold (ECF No. 77 (sealed), pp 32-33, 56-58), Bell did not even attempt to calculate different rebate payments by Plaintiffs under the two scenarios. Bell employed no methodology to account for the different rebate amounts under the two comparative scenarios, choosing instead to make an unsupported assumption that the amount of rebates were the same under the two scenarios.

## ARGUMENT

### I.    The standard for a motion for reconsideration.

Subject to the Court's discretion, a motion for reconsideration shall be granted only if the movant can (1) "demonstrate a palpable defect by which the court and the parties . . . have been misled" and (2) "show that correcting the defect will result in a different disposition of the case." E.D. Mich. LR 7.1(h)(3). "A 'palpable defect' is a defect that is obvious, clear, unmistakable, manifest, or plain." *United States v. Lockett*, 328 F. Supp. 2d 682, 684 (E.D. Mich. 2004).

Although a motion for reconsideration is not mentioned in the Federal Rules of Civil Procedure, it is often treated as a motion to amend judgment under Rule 59(e). *McDowell v. Dynamics Corp. of America,* 931 F.2d 380 (6th Cir.1991); *Shivers v. Grubbs*, 747 F.Supp. 434 (S.D. Ohio 1990).  There are three grounds for amending a judgment under Rule 59(e): (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; and (3) to correct a clear error of law or to prevent manifest injustice. *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).

**II.** **<u>This Court's November 9, 2023 Opinion and Order is clearly erroneous because it fails to consider the possibility that the jury will reject the unsupported assumptions of Plaintiffs' damage expert, and it ignores other possible scenarios indicating that Plaintiffs suffered no damages.  This Court's decision prevents Shaya from receiving a fair trial because Shaya will not be allowed to show Plaintiffs made a profit – and thus suffered no damages - if its expert's unsupported assumptions are rejected.</u>**

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

F.R.E. 401.  As this Court noted in its November 9, 2023 Opinion and Order, "'The rules regarding relevancy, however are quite liberal[.]'"  ECF No. 185, PageID.4922 (citation omitted).  "'Normally, motions in limine are not proper procedural devices for the wholesale disposition of theories or

11

defenses.'" *Bell v Prefix, Inc.*, 2009 U.S. Dist. LEXIS 101889*3 (E.D. Mich. 2009), quoting *SPX Corp. v. Bartec USA, LLC*, 574 F. Supp. 2d 748, 2008 WL 3850770, at *3 (E.D. Mich. 2008).

From the outset of its Analysis within its November 9, 2023 Opinion and Order, this Court committed error:

> Roche contends that Shaya, operating through shell companies, conspired with an authorized Roche distributor to deceive Roche into selling him low-priced NFR blood-glucose test strips, which he then re-sold at a large profit to gray-market pharmaceutical companies, who in turn sold them to pharmacies where they were dispensed at much higher retail prices.

In fact, Plaintiffs have stipulated they never sold test strips directly to Shaya or his companies, and Plaintiffs admit they paid no monies to Shaya. (ECF No. 183-1, PageID. 4846).[9]

After starting with an incorrect premise, this Court's determination that manufacturing costs and net profits are irrelevant is based solely on its unquestioned acceptance of the reasoning of Plaintiffs and their expert:

---

[9] It is undisputed Plaintiff had no direct interaction with Plaintiffs, and Plaintiffs paid Shaya no monies. (ECF No. 76-3, PageID 1486-1487, answers to requests to admit 1, 4). Notwithstanding these facts, this Court has ignored case law rejecting a claim for unjust enrichment where the plaintiff conferred no direct benefit on the defendant and there was no direct interaction between plaintiff and defendant. *Schechner v Whirlpool Corp.*, 237 F.Supp. 3d 601, 618 (E.D. Mich. 2017). Had this Court followed *Schechner*, it would have dismissed the unjust enrichment claim. For unexplained reasons unrelated to the merits of the motions, this Court has yet to decide a substantive motion in Shaya's favor.

> Roche thus is claiming that it suffered damages from Shaya's diversion of its diabetes test strips "in the amount of the difference between the price for which it sold the diverted NFR test strips to Northwood ($10.67 per box) and the price it would have received for the retail test strips the patients would otherwise have purchased (about $65 per box in 2014 and about $71 per box in 2015)." (*Id.* ¶ 126.)   In addition, Roche paid rebates to insurers of about $43 per box for retail test strips.

(ECF No. 185, PageID. 4926).

This Court repeated its acceptance of Plaintiffs' damage calculation when it later stated:

> But an analysis of the manufacturing costs of the test strips is irrelevant to Roche's damages claim – which, again, is the difference in wholesale price between a retail test strip and diverted NFR test strips, multiplied by the number of diverted test strips. Because the claimed harm is caused by replacing one Roche manufactured product with another Roche manufactured product, and the manufacturing costs for retail test strips and NFR test strips are the same, they cancel each other out, and do not factor into that damages calculation.

(ECF No. 185, PageID. 4927-4928).   What this Court either fails to appreciate or ignores is that there is no evidence a "diverted" NFR test strip replaced the sale of a retail test strip.  If that assumption is rejected – which the jury is free to do – the profit made by Roche on each of the transactions at issue is the price Roche charged to Northwood, less Roche's manufacturing cost.  If defies all logic and explanation that this Court would prevent Shaya from presenting proofs that present an alternative damage

13

model – one indicating Plaintiffs suffered no damages – if the unsupported assumptions of Plaintiffs, Plaintiffs' experts and this Court are not accepted.

Throughout its November 9, 2023 Opinion and Order, this Court ignores the arguments Shaya has made throughout this case and in response to Plaintiffs' motion in limine: (1) Plaintiffs and their expert assume without any factual support that all of the sales of 1.5 million boxes of strips at issue would have been replaced by an equal amount of sales in the retail channel; (2) Plaintiffs and their expert assume without support that Plaintiffs paid rebates on all 1.5 million boxes, lowering Plaintiffs' profit margin. Both assumptions are completely unsupported by any factual record – Plaintiffs admit they have no idea as to where 1 million of the boxes were sold - and ignore other possible alternatives for the 1.5 million boxes of strips allegedly diverted, including: (1) the sale of a "diverted" test strip replaced the sale of a test strip from another manufacturer of test strips and did not replace the sale of a Roche test strip in the retail channel; and (2) rebates were not paid on the 1.5 million boxes of strips. **If the assumptions of Plaintiffs' expert are rejected, evidence of Roche's manufacturing costs, and that that Roche made a profit on the transactions, rebuts Roche's damage claim.** Unfortunately, this Court wants to deprive Shaya of the ability to assert this defense.

According to this Court, "Shaya fails to sufficiently explain how Roche's manufacturing costs are relevant to Roche's claim for damages…" (ECF No. 185, PageID. 4927).  What this Court should have focused on is whether Roche's manufacturing costs and evidence Plaintiffs made a net profit on the transactions at issue (if no unsupported assumptions are considered) are relevant to Shaya's defense that the only admissible evidence establishes Roche made a profit on the transactions and did not incur any damages.  Shaya should not be penalized because this Court does not understand the very simple logic that establishes the relevance of a proofs which establish Plaintiffs suffered no damages.

Evidencing clear bias, this Court further erred when it conflated its decision on Shaya's motion to strike Plaintiffs' damage expert with a ruling on the relevance of the profit Plaintiff made on the transactions at issue. ("[T]he Court has already decided, and rejected, Shaya's arguments attacking the assumptions made by Roche's damages expert…")  (ECF No. 185, PageID. 4927).  Although this Court has refused to strike Plaintiffs' expert, it is up to the jury, and not this Court, to decide whether unsupported assumptions by Plaintiffs' expert should be accepted.  When this Court denied Shaya's motion to strike Plaintiffs' expert Bell, this Court noted:

> *Daubert* emphasizes that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and that "[t]hese conventional devices, rather than wholesale exclusion…, are the appropriate safeguards where the basis of [expert] testimony meets the standards of Rule 702. *Daubert*, 509 U.S. at 596.

(ECF No. 97, Page ID 3351). Contrary to this Court's own words, this Court's November 9, 2023 Opinion and Order substantially limits Shaya's cross-examination of Plaintiffs' expert and Plaintiffs' other witnesses, effective precluding Shaya from presenting any damage defense through Plaintiffs' witnesses, a legitimate defense strategy.

It is unfortunate that this Court does not understand the utility of Shaya's damage defense which, in part, establishes through Plaintiffs' own witnesses that Plaintiffs made a profit on the transactions at issue. Plaintiffs' damage model is premised on two highly-suspect, factually unsupported assumptions, and this Court's decision on Plaintiffs' motion in limine necessarily ignores the vagaries of juries and rests on the presumption that the jury will either believe or disbelieve Plaintiffs' damage model presented through its expert. Although this Court did not strike Plaintiffs' expert, this Court surely did not intend to limit the cross-examination of this expert in such a manner that would preclude Shaya from establishing and arguing Plaintiffs suffered no damages and, in fact, Plaintiffs made a profit on the

transactions at issue, evidence which could have a profound impact on a jury.

In their motion in limine, Plaintiffs did not cite a single case that supports the requested relief, and this Court relied on no case cited by Plaintiffs.  However, this Court so desperately wants to preclude Shaya from challenging Plaintiffs' damage model at trial that it cited *Bunch v Pacific Cycle, Inc*., 2015 WL 11622952, at *10 (N.D. Ga. April 27, 2015), **a case not cited by Plaintiffs**, for the proposition that excluding evidence pertaining to profit margin on the bicycle will not plaintiffs from presenting their case.  (ECF No. 185, PageID. 4929-4930).  Quite clearly, *Bunch* was a personal injury products liability case, and it is not a case in which, like here, plaintiffs were seeking lost profits on the sale of goods.

As it did when deciding the prior motion to strike Plaintiffs' expert, this Court should let the jury determine whether to accept any of the testimony developed through cross-examination of Plaintiffs' damage expert.  During this cross-examination based in part on Plaintiffs' net profits, "The weight of the expert's testimony must be for the trier of fact." *Mannino v International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

## **CONCLUSION**

Defendant Christopher Shaya requests that this Court grant his motion for reconsideration, and that this Court deny Plaintiffs' Plaintiffs' motion in limine to preclude evidence or argument regarding manufacturing costs or profit margins.


Dated: November 24, 2023

*/s/Edward G. Lennon*
Edward G. Lennon (P42278)
Attorney for Christopher Shaya


**Proof of Service**

I certify that on November 24, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record herein at their respective addresses as disclosed on the pleadings.

Signature: */s/Edward G. Lennon*_____
Edward G. Lennon
355 S. Old Woodward, Ste. 100
Birmingham, MI 48009
(248) 723-1276
elennon@lennonlawpllc.com